## COMMONWEALTH *vs.* EDWARD P. JEFFRIES.[*]

Press copies of letters are admissible in evidence against a party, if they purport to have been written by him and are found in his possession and appear to be in his handwriting and the originals cannot be procured; and, after a verdict against him, a new trial will not be granted for the reason that experts were allowed to testify that in their opinion the originals of the press copies were in his handwriting, instead of testifying that the copies appeared to be in his handwriting.

Telegraphic messages are admissible against a party as evidence of his declarations, and also as evidence tending to show communications to the person to whom they were addressed, if proved to be in his handwriting, and to have been received at the telegraph office and sent over the wires properly directed to a person who was then living at the place of their destination.

In an indictment for obtaining goods by falsely pretending that the defendant was acting as a broker for an undisclosed principal, the vendor may testify that he gave credit to such principal, although in his books of account he entered the transaction as a sale to the defendant, and made out a bill of parcels in that form; and it is proper to submit it as a question of fact to the jury to determine to whom the credit was in fact given.

In such indictment, evidence that the defendant was deeply insolvent at the time of making the false representations relied on is competent against him, for the purpose of showing his intent.

In such indictment, an averment that the defendant falsely pretended that he had an order from a certain person, whose name he did not disclose, to purchase the goods at a certain price, is sustained by proof that he falsely pretended that he had an order from that person to purchase the goods, and accordingly bargained for them on his behalf at that price.

So in such indictment there is no variance between an averment that the vendor was induced by reason of the false pretences to accept the offer and sell and deliver the goods, and proof that his inducement was the expectation of receiving the price from the undisclosed principal, if it appears that this expectation was created by the false pretences of the defendant.

A count in such indictment which alleges that the defendant falsely pretended that he had an order from a certain person in New York, whose name he did not disclose, to purchase the goods, is not sustained by proof that he falsely pretended that he had an order to purchase them, without stating that the order came from a person in New York.

An indictment may be sustained which charges that the defendant obtained goods by false pretences made by the defendant " in his capacity as merchandise broker."

---

[*] This case and the four following cases were argued in March 1864, before the CHIEF JUSTICE and Justices DEWEY, HOAR and CHAPMAN.

**So** an indictment may be sustained which charges that the defendant, by falsely pretending that he was acting as a broker for an undisclosed principal in the purchase of goods, induced the vendor to accept his offer and sell the goods to said undisclosed principal, and to deliver the same to the defendant as his broker.

INDICTMENT for obtaining goods by false pretences.

The first count charged that the defendant, at Boston, on the 19th of August 1863, " with intent to cheat and defraud George M. Barnard, Horatio Hollis Hunnewell and Hollis Hunnewell, all of said Boston, of and out of certain sound linseed which they the said George M. Barnard, Horatio Hollis Hunnewell and Hollis Hunnewell then and there had, possessed and owned, did then and there unlawfully, knowingly and designedly, falsely pretend and represent to said Barnard, Hunnewell and Hollis Hunnewell, that he the said Jeffries was then and there a merchandise broker, and that he had received and then and there had in his capacity as merchandise broker as aforesaid an order from certain persons in New York, meaning thereby the city of New York in the county and state of New York, whose names the said Jeffries did not then and there disclose to the said Barnard, Hunnewell and Hollis Hunnewell, and whose names are to the said jurors unknown, then and there to purchase in behalf of said persons a large quantity of sound linseed, to wit, two thousand bags of sound linseed, at the price of three dollars for each bushel of said sound linseed, and the said Jeffries then and there falsely offered, in his said capacity as merchandise broker, in behalf of said persons and in pursuance of the order which he the said Jeffries then and there falsely pretended and represented that he in his said capacity as merchandise broker had received and had as aforesaid, to the said Barnard, Hunnewell and Hollis Hunnewell, to purchase of them two thousand bags of sound linseed which they the said Barnard, Hunnewell and Hollis Hunnewell then and there had, owned and possessed, at the price of three dollars for each bushel of said sound linseed, and they the said Barnard, Hunnewell and Hollis Hunnewell, then and there having and desiring to sell two thousand bags of sound linseed at the price of three dollars for each bushel of said sound linseed, and then and there believing the said false pretences,

representations, declarations and offer so falsely made as aforesaid by the said Jeffries to be true, and being deceived thereby, were induced by reason of the false pretences, representations, declarations and offer so falsely made as aforesaid then and there to accept the offer so falsely made as aforesaid by the said Jeffries to them the said Barnard, Hunnewell and Hollis Hunnewell, as aforesaid, and then and there to agree to sell to the said persons from whom the said Jeffries falsely pretended and represented that he the said Jeffries in his said capacity as merchandise broker had received an order to purchase a large quantity of sound linseed, to wit, two thousand bags of sound linseed, at the price of three dollars for each bushel of said sound linseed as aforesaid, two thousand bags of sound linseed at the price of three dollars for each bushel of said sound linseed, and then and there induced, by reason of the false pretences, representations, declarations and offer so falsely made as aforesaid by the said Jeffries, did sell to the said persons from whom the said Jeffries falsely pretended and represented that he the said Jeffries in his said capacity as merchandise broker had received said order to purchase two thousand bags of sound linseed, at the price of three dollars for each bushel of said sound linseed, two thousand bags of sound linseed at the price of three dollars for each bushel of said sound linseed; and they the said Barnard, Hunnewell and Hollis Hunnewell were also then and there induced by reason of the false representations, declarations and offer so falsely made as aforesaid to deliver, and then and there being so induced did deliver, in pursuance of their acceptance of the offer aforesaid falsely made as aforesaid and of their agreement aforesaid induced by the false pretences, declarations, representations and offer so falsely made as aforesaid, and of their sale aforesaid induced and made as aforesaid, to the said Jeffries in his said capacity as merchandise broker two thousand bags of sound linseed, at the price of three dollars for each bushel of said sound linseed, each of said bags of sound linseed then and there containing three and one half bushels of sound linseed and each bag of said sound linseed being then and there of the value of eleven dollars and fifty cents, and being then and there of the

property of the said Barnard, Hunnewell and Hollis Hunnewell; and the said Jeffries did then and there in his said capacity as merchandise broker receive the said two thousand bags of sound linseed, and each bag thereof at the price of three dollars for each bushel of said sound linseed, in pursuance of the said sale and delivery as aforesaid; and the said Jeffries did then and there in his said capacity as merchandise broker make the said false pretences, representations, declarations and offer as afore-said to the said Barnard, Hunnewell and Hollis Hunnewell, to induce the said Barnard, Hunnewell and Hollis Hunnewell to sell to the said persons hereinbefore described, and to deliver to him the said Jeffries in his said capacity as merchandise broker the said two thousand bags of sound linseed and each bag thereof in manner and form aforesaid, and the said Jeffries in his said capacity as merchandise broker did then and there receive and obtain from the said Barnard, Hunnewell and Hollis Hunnewell the said two thousand bags of sound linseed, and each bag thereof, of the value aforesaid, of the property of them the said Barnard, Hunnewell and Hollis Hunnewell, by means of the false pretences, representations, declarations, and offer so freely made as aforesaid and with intent to cheat and defraud.

" Whereas in truth and in fact the said Jeffries had not then and there in his said capacity as merchandise broker, or other-wise, received, and did not then and there in his said capacity as merchandise broker, or otherwise, have an order from said persons in said New York, or from any person or persons any-where, for the purchase, in his capacity as merchandise broker, or otherwise, in behalf of said persons, or in behalf of any one, of a large quantity of sound linseed, to wit, of two thousand bags of sound linseed, or of any sound linseed; and did not then and there in his said capacity of merchandise broker, or otherwise, have from said persons, or from any person or persons, an order for the purchase in behalf of said persons or in behalf of any one of any linseed of sound quality or otherwise at the price of three dollars for each bushel of said sound linseed, as the said Jeffries then and there well knew.

"And so the jurors aforesaid, upon their oaths aforesaid, do say

that the said Jeffries, by means of the false pretences aforesaid, on the said nineteenth day of August in the year of our Lord one thousand eight hundred and sixty-three, at said Boston in said county of Suffolk, in his said capacity of merchandise broker as aforesaid, unlawfully, knowingly, designedly and fraudulently did obtain and receive from the said Barnard, Hunnewell and Hollis Hunnewell the said sound linseed, of the value aforesaid, of the property of the said Barnard, Hunnewell and Hollis Hunnewell, with intent to defraud."

The second count was in similar form, charging another similar transaction with the same persons, for thirteen hundred and seventy bags of linseed, on the 21st of August 1863. There was also another count, upon which the defendant was acquitted.

At the trial in the superior court, before *Russell*, J., George M. Barnard was called as a witness, and the material portions of his testimony were as follows :

" I knew and had dealt largely with the defendant as a broker in linseed, and only as a broker, except in one instance in 1861. He came to my counting room on the 19th of August last, and asked whether I was disposed to sell linseed? I said I would not sell at the price quoted, $2.90. I said, ' I suppose they will give only $2.90, and I am not willing to sell.' He said he had an order from parties in New York for two thousand bags of linseed ; and after some conversation he said, 'At what price will you sell it ? ' I said, at three dollars a bushel. I think I said, ' Can you buy at $3.00 ? ' He said ' Yes ; that he could buy of the Tudor Company and William Perkins at that price.' I said, ' I will sell at $3.00, but I want the money immediately.' He said vessels were scarce, and there might be some delay in getting vessels to haul to East Boston and take the seed, but that he would send to New York and get the notes of the parties discounted, and so get the money certainly within a week. He said the parties did not wish their names disclosed, as they were constantly using large quantities of seed, and did not wish to be known in the market as buyers. I then made an entry in my memorandum book, in his presence, as follows, to wit : ' 19th

August. Sold E. P. Jeffries & Co. 2000 bags linseed at $3.00. Cash within ten days. E. P. J. ½. Secret.'

" The word 'secret' refers to the price. The meaning of ' E. P. J. ½ ' is, that he was to have ½ per cent. brokerage. I do not know that the defendant saw this entry made. If I sold to a broker for himself I should make the entry ' $3.00 less ½ per cent.' The buyer claims that if we save brokerage he is to have the ½ per cent. though not as brokerage. The linseed was to be sound. That is always understood, unless something else is expressed. In the course of business linseed is used by the crushers to extract the oil by crushing. I knew all the crushers in New York, I think, and have made myself acquainted with their standing and business credit. After making the entry in the memorandum book, I gave him an order on the warehouse-man as follows, to wit:

" ' Boston, August 19, 1863. Please deliver to the order of Messrs. E. P. Jeffries & Co. two thousand bags linseed, per ship Resolute from Calcutta. ($_\frac{B.H.}{R.}$) George M. Barnard.'

" $_\frac{B.H.}{R.}$ means, Barnard & Hunnewells, per Resolute."

The witness also testified that he did not keep any ledger, and that the other entries of the transaction were in his waste-book and in his sales-book. The entry in the waste-book was as follows, to wit:

" Suspense Dr. To sales of linseed per Resolute ($_\frac{B.H.}{R.}$) 2000 bags linseed, 341,605 lbs. — tare 48–10 of 9600 lbs. — 332,005 lbs. net = 6384$\frac{27}{53}$ bushels, at $3.00, $19,154.13. E. P. Jeffries & Co., cash; " and the same entry was made in the sales-book.

The witness was then asked by the district attorney to whom he gave credit in making this sale. The defendant objected to this question, upon the ground that the entries of the transaction in the books of the witness furnished the best evidence and ought not to be controlled by this oral evidence. The judge overruled the objection, and the witness thereupon answered that he gave credit to " one of the crushers in New York."

The government proved that upon the foregoing order and the order hereinafter referred to relating to the second purchase

the defendant caused the seed to be removed from the ware-house and shipped to New York, to Messrs. T. & G. Rowe and to Messrs. Campbell & Thayer, and introduced evidence tending to show that he afterwards sold the seed to them at a less price than the same were sold by Barnard, on the same days : n which he bought of Barnard. This witness on cross-examination testified that he rendered the defendant a bill of the linseed as follows, to wit:

" Boston, 19th August 1863. Messrs. E. P. Jeffries & Co., Bought of G. M. Barnard. $^{B. H.}_{R.}$ 2000 bags linseed, wg 341,605 lbs. gross, 9600 lbs. tare 48 lbs. pr. 10 bags, 332,005 lbs. net = 6384$\frac{27}{32}$ bushels, at $3.00, $19,154.13. Cash within ten days. Received payment."

In regard to the sale under the second count the evidence was as follows: Mr. Barnard testified that the defendant met him on the same day on which the transaction of the two thousand bags took place, and said, " Will you sell the balance of that linseed at the same price?" I said that I would. Then he said, " I have an order from another party for eighteen hundred bags, but they want it at $2.75, which is out of the question; but I think by informing them confidentially of this previous sale at $3, I can bring them up to your price." It appeared that a message was sent by the defendant through J. M. Barnard and received by George M. Barnard, on the 21st of August, in these words, " Will you tell your brother that I will take the seed which he has offered?" Mr. Barnard further testified thus: " Upon receiving this message I then made the following entry in my memorandum-book: 'August 21st. Sold E. P. Jeffries & Co. 1800 bags linseed, balance per Resolute, at $3 per bushel. Sound. E. P. J. $\frac{1}{2}$.' The word 'sound' meaning free from damage. 'E. P. J. $\frac{1}{2}$' means as before stated. The sound seed had at this time been separated from the unsound; and I sent the defendant the following order on the warehouseman, which was for all the sound there was of the 1800: 'Boston, 24th August 1863. Please deliver to the order of Messrs. E. P. Jeffries & Co. 1370 good bags of linseed, ex Resolute. George M. Barnard, Per W. E. Jenkins. To A. C. Lombard, Esq., East Boston Wharf.' "

On this was the following indorsement in the defendant's handwriting: " Please deliver F. Baker or order. Ed. P. Jeffries & Co."

The government produced a book containing what they claimed to be press copies of the defendant's letters, and proved by a witness who was assignee of the defendant in insolvency that he took the book with other papers from the defendant's safe. The witness knew the defendant's handwriting, and was acquainted with the process of taking press copies; and he was asked, " In whose handwriting was the original, of which this purports to be a copy ? " The defendant objected, but the judge permitted the question to be put, upon which the witness testified that the originals of the press copies were, in his opinion, in the defendant's handwriting.

The district attorney then offered evidence from two clerks of the defendant, who were the only persons besides the defendant who had access to said book or attended to the mailing of the defendant's letters, that the book contained the copies of the defendant's business letters during the months of July and August 1863; that it was the general practice of the defendant's clerks to press his letters into the said book, and then to prepare and take the letters to the post-office, though neither could testify as to having done thus in regard to the particular letters which the district attorney proposed to read. The government then offered evidence to show that the parties to whom the said copies purported to be addressed, and who lived in New York, had been requested to deliver to the district attorney, who in person made the demand, all letters, despatches and messages received by them from Edward P. Jeffries or Edward P. Jeffries & Co. between the 15th and 30th of August last, but that they declined so to do; and that the district attorney had given due notice to the defendant's counsel to produce the originals of all letters and telegrams which he addressed to any parties connected with these transactions, and especially to R. H. Hunter, the Messrs. Rowe, and to Campbell & Thayer, and that search had been made for all originals in the defendant's possession by his assignee, but that none had been found. It also appeared in

evidence that R. H. Hunter, of New York, was the broker in that city through whom the defendant transacted his business in New York, and that T. & G. Rowe and Campbell & Thayer were his principal correspondents in New York; and the district attorney thereupon claimed the right to read the said press copies in evidence. The defendant objected, but the judge permitted them to be read.

The government produced certain papers, with evidence which proved that they were written in the defendant's handwriting, upon printed bills or headings such as are used at certain telegraph offices, and proved by the operators in the said offices that said messages were received and sent over the wires directed to the parties in New York to whom they purported to be directed, who were the said R. H. Hunter, T. & G. Rowe, and the said Campbell & Thayer; and thereupon the district attorney claimed the right to read them to the jury, both as admissions of the defendant, and as communications made to the parties to whom they purported to be addressed. The defendant objected, but the judge admitted them as competent evidence of the declarations of the defendant, and, after the evidence in the case had been all put in, ruled that they were admissible as evidence tending to show communications made to the parties in New York.

The district attorney then offered in evidence the defendant's petition in insolvency, with his schedule of creditors and of assets, signed and sworn to by him; the petition on the 14th of September, and the schedule on the 21st of September 1863; and offered to prove that his indebtedness was not materially different on the 19th and 21st of August, when the transactions with Barnard took place, and that on the 19th and 21st of August the defendant was in fact deeply insolvent. The judge admitted this evidence, against the defendant's objection, solely as tending to prove the intent of the defendant at the time of making the representations alleged.

At a subsequent stage of the trial, the said Barnard explained that he was induced to part with the thirteen hundred and seventy bags on the expectation of receiving $3.00 per bushel from

the purchaser in New York, founded upon the representations of the defendant already hereinbefore testified to by him. The witness had before been examined as follows:

Q. " In reference to the first transaction on the 19th of August, what was it that induced you to part with your property ? "

A. " The expectation of having $3 a bushel from one of the crushers in New York."

Q. " What was it that induced you to part with the 1370 bags ? "

A. " The expectation of getting $3 a bushel in cash for the quantity delivered."

Q. " Was there any other inducement that influenced you to part with your property ? "

A. " No, sir."

Q. " In the second case, from whom was the money to be received ? "

A. " I was to receive the money; I don't know whom it was to come from."

Q. " Were there any other inducements than those you have stated ? "

A. " My knowledge of the credit of the parties in New York."

Q. " To whom did you give credit ? "

A. " To one of the crushers in New York."

And no other evidence than what is before set forth was given to sustain the allegations of the false pretences set forth in the indictment.

The evidence for the government having been closed, the defendant moved the court to instruct the jury, upon the first count: 1. That upon the original charge, bill of sale, order for delivery, entries in the waste and sales books, and the testimony of said Barnard as to the terms and mode of payment, there was in law a sale from him to the defendant of the said seed; or, 2. That upon the original charge, entries in the books, bill of sale and order for delivery, the law presumed a sale to the defendant, and that there was no sufficient evidence to control that legal presumption. But the judge refused so to rule, and ruled that it was wholly a question of fact for the jury to judge of, upon the evidence furnished by the said acts and entries and by the testimony in the case.

Upon the evidence offered upon the second count, the defendant requested the judge to rule and instruct the jury: 1. That it did not, if believed, sustain the allegations setting forth the false pretences in the second count; 2. That upon this as upon the first count, upon the evidence, there was in law a sale to the defendant, or a legal presumption of a sale, which there was not sufficient evidence to control. But the judge refused so to rule, and ruled upon this point as he had before ruled with reference to the first count.

The defendant also contended that there was a variance between the allegations in the first two counts in the indictment and the proofs, in respect to the pretences by which the defendant obtained the property, and moved the court to direct a verdict in his favor; but the judge overruled the motion.

The judge was also requested to instruct the jury to return a verdict for the defendant, because, under the statute, although his fraudulent intent might be to obtain the property for himself or a third party, there must be something more than the obtaining of manual or physical possession; that there must be such a possession of and control over the property as would enable the person acquiring it, but for the fraud, to exercise ownership over it, and to sell and dispose of it to a *bona fide* purchaser without notice of the fraud, and that there was no evidence to show the acquiring of such possession as the statute requires; but the judge declined so to rule.

The defendant also contended that the indictment could not be maintained, inasmuch as it charged no offence to have been committed by him as an individual, but only as a merchandise broker, and moved the court so to rule. But the judge refused so to do.

The case was submitted to the jury under instructions to which no special exception was taken, and a verdict was returned of guilty upon the first and second counts, and not guilty on the third. The defendant alleged exceptions, and moved in arrest of judgment.

*B. F. Thomas & E. D. Sohier*, for the defendant. The admission of the press copies of the letters was erroneous. See

*Commonwealth* v. *Eastman,* 1 Cush. 189, 217 ; *Nodin* v. *Murray,* 3 Camp. 228. So also of the telegraphic messages. *Greenfield Bank* v. *Crafts,* 4 Allen, 447. There was no evidence of the course of business in New York.

The evidence of the defendant's insolvency was incompetent. It was admitted before any ground of defence was suggested. It did not appear that Barnard knew the fact, and therefore the evidence was not competent to show that he did not sell to Jeffries. It had no tendency to show a fraudulent intent on the part of the defendant. Yet this is the precise point in reference to which it was admitted. There is no authority in support of the ruling. Poverty cannot be shown for the purpose of proving crime. It is impracticable to administer justice on such a principle. Before the law, the rich and poor stand on an equality. And in numerous cases, which seem to be decisive of the present case, such evidence has been held inadmissible. *Agawam Bank* v. *Sears,* 4 Gray, 95. *Commonwealth* v. *Stebbins,* 8 Gray, 492. *Hilton* v. *Scarborough,* 5 Gray, 422. *Commonwealth* v. *Hilliard,* 2 Gray, 294. *Commonwealth* v. *Madden,* 1 Gray, 486. *Orcutt* v. *Ranney,* 10 Cush. 183. *State* v. *Penley,* 27 Conn. 587. The evidence of Barnard as to the party to whom he gave credit should have been excluded. There was written evidence of the contract, which it was not competent to contradict by oral testimony. *Bray* v. *Kettell,* 1 Allen, 80. Upon this written evidence, and the testimony of Barnard, the sale was in law to the defendant; or at least the law would presume a sale to the defendant, and there was no sufficient legal evidence to control that presumption. *Kilby* v. *Wilson,* Ry. & Mood. 178. *Pennell* v. *Alexander,* 3 El. & Bl. 283. *Storr* v. *Scott,* 6 C. & P. 241. Even if in law the sale should be construed to be either to the defendant or to the unknown principal, at the election of the vendors, there was a variance. There was also a variance between the averment and proof of the false pretences as to the orders alleged to have been received. A vital part of the pretence alleged was the price. But the proof did not include any statement as to the price. *Commonwealth* v. *Drew,* 19 Pick. 184. *Commonwealth* v. *Davidson,* 1 Cush. 33. *People* v. *Haynes,*

14 Wend. 546. *Rex* v. *Plestow*, 1 Camp. 494. There was a variance as to the place from which the order referred to in the second count came; and also in reference to the inducement of the vendors to part with their property.

The indictment charges no offence. The allegations as to the capacity in which the acts were done cannot be rejected as surplusage. The only possession alleged to have been had by the defendant is, in his capacity as a merchandise broker. Such a possession is not within the Gen. Sts. *c.* 161, § 54. He must have obtained such a possession as would have enabled him to convey a good title. The indictment charges a sale to certain persons in New York, and a delivery of the property to their broker, who received and held the property as such broker. It does not charge a false and pretended sale, but a real sale.

*Foster*, A. G., for the Commonwealth, cited, as to the admission of the evidence to whom credit was given, *Thompson* v. *Davenport*, 2 Smith's Lead. Cas. (5th Amer. ed.) 358, and cases cited; *James* v. *Spaulding*, 4 Gray, 452; and as to the sufficiency of the indictment, *Commonwealth* v. *Goddard*, 4 Allen, 312; *Commonwealth* v. *Lannan*, 1 Allen, 590; *Commonwealth* v. *Strain*, 10 Met. 521.

BIGELOW, C. J. We have given to the questions raised in the present case very full and careful consideration, not only on account of their intrinsic importance, but also from a due regard to the views and arguments of the learned counsel for the defendant, which they have urged upon our attention with great ability, and apparent confidence in the correctness of their positions. The result of our deliberations has been to lead to conclusions entirely satisfactory to our own minds, which we now proceed to state. To render the case clear and intelligible, it will be necessary to give a brief outline of the leading facts on which the charge against the defendant is founded. The indictment is for obtaining goods by false pretences. At the trial in the superior court, the evidence offered in support of the prosecution tended to show that the defendant, being by occupation a merchandise broker, falsely pretended and represented to the prosecutors that he was authorized as the agent and broker of certain

persons in New York, whose names he did not disclose, to pur-
chase a large amount of linseed at the price of three dollars per
bushel; that the prosecutors, believing these pretences and repre-
sentations to be true and relying upon them, did agree to sell to
said persons in New York for whom the defendant purported to
act several thousand bags of linseed at the price named by the
defendant; and that in pursuance of such agreement they did
deliver the same to the defendant, who by means of said false
representations and pretences received and obtained said mer-
chandise with intent to cheat and defraud the prosecutors there-
of. In support of these alleged facts much evidence was offered
by the Commonwealth at the trial, to the competency of some
portions of which objections were taken by the defendant's coun-
sel, and overruled by the court. This class of exceptions we
propose first to consider.

1. The court admitted press or machine copies of certain let-
ters, purporting to have been written by the defendant, to be read
to the jury. These we think were competent on two grounds.
Independently of proof that the originals were in the hand-
writing of the defendant, the copies were admissible as docu-
ments in his possession, and to which he had constant access.
They therefore furnished room for the inference that he was
acquainted with their contents, and affected him with an implied
admission of the statements contained in them. This is the
ordinary rule of law applicable to papers found in the possession
of a party. 1 Greenl. Ev. § 198, and cases cited. Evidence of
a precisely similar character was admitted without objection in
*Commonwealth* v. *Eastman*, 1 Cush. 189, 195. Nor are we able
now to see any valid reason for excluding it. But upon another
and distinct ground we are of opinion that the evidence was
admissible. The press copies, as they are called, were in fact
proved to have been in the handwriting of the defendant. They
were in truth a part of the original letters as written by him,
transferred by a mechanical pressure to other sheets. But such
transfer did not destroy the identity of the handwriting as shown
on the impression, or render it unrecognizable by persons ac-
quainted with its characteristics. These to a considerable extent

it must necessarily still retain, so that a person having adequate knowledge could testify to its genuineness with quite as much accuracy as if he had before him the original sheets on which the letters were first written. Writings thus transferred are not unlike written documents which have been defaced or partially obliterated by exposure to dampness, rough usage or the wasting effect of time. Such papers may not possess all the distinctive features of the original handwriting, but their partial destruction or obliteration will not render them inadmissible as evidence, if duly identified by testimony. A press copy, it is true, might furnish a very unsatisfactory standard of comparison by which to determine whether another paper, the handwriting of which was in controversy, was written by the same person, because the mechanical process to which it had been subjected in transferring it would, by spreading the ink and blurring the letters, necessarily somewhat affect its general resemblance. For this reason it was rejected when offered for such purpose in *Commonwealth v. Eastman*, 1 Cush. 217. But although incompetent as a means of comparison by which to judge of the characteristics of a handwriting which is in dispute, it might still retain enough of its original character to be identified by a witness, when its own genuineness was called in question. Such in effect was the nature of the testimony offered at the trial, although the mode of putting the inquiry to the witness was defective and irregular. Strictly he should have been asked if the letters shown to him appeared to be in the handwriting of the defendant; then by proving that they were press copies it would follow that the letter from which the impressions were made were his also. The defect was in so framing the question as to elicit the opinion of the witness concerning the handwriting and the necessary consequence of that opinion in the same answer. But the substance of the evidence was clearly competent. It was accompanied by proof of due effort on the part of the government to procure and produce the original letters, and was thus brought within the principle and reason of the rule on which evidence, in its nature secondary, of the contents of written papers is held to be admissible.

**2.** Objection was also taken to the competency of certain telegraphic messages which were shown to be in the handwriting of the defendant, as tending to prove communications made by him to parties in New York to whom they were addressed. Inasmuch as these papers were entirely competent as admissions by the defendant, it is difficult to see how it was material to show that their contents were made known to the persons to whom they were sent, or in what way the rights of the defendant could have been prejudiced at the trial by the fact that the jury were left to infer that the messages actually reached their destination. But, apart from these considerations, we cannot doubt that they afforded legitimate ground for the inference which the court permitted to be drawn from them. It was affirmatively proved by the operators at the telegraph offices that all these messages were received by them and duly transmitted over the wires, directed to the parties to whom they were addressed by the defendant. No rule of evidence is better settled or more clearly founded in good sense and sound policy than that which authorizes presumptions or inferences of fact to be deduced from the proof of certain other facts, which, according to the common experience of mankind, or the usual course of business, naturally or necessarily lead to the result or conclusion which is sought to be drawn from them. Such presumptions or inferences depend on their own natural force and efficacy in generating a belief or conviction in the mind as derived from those connections which are shown by experience, irrespective of any legal relation. The process of ascertaining one fact from the existence of another is essential to the investigation of truth, and prevails in courts of law as well as in the ordinary affairs of life, especially in cases where there is a well known and established usage or course of business, and primary evidence of the existence of a fact is wanting or difficult to be obtained. On this ground, the ruling of the court as to the effect of the evidence in question was clearly right. It comes within the principle on which it is held that proof that letters were deposited in the post-office duly directed is evidence tending to show that they reached their destination and were received by the persons

to whom they were addressed. 1 Greenl. Ev. § 40, and cases cited. *Dana* v. *Kemble*, 19 Pick. 112. The case of *Greenfield Bank* v. *Crafts*, 4 Allen, 447, gives no countenance to any different doctrine. It decides only that the presumption in such case is not conclusive, but that it is open for the jury to draw the inference if they see fit. The ruling in the case at bar went no farther.

3. It is also objected that the court erred in admitting Barnard, one of the prosecutors, to testify to whom he gave credit in negotiating a sale of the merchandise with the defendant. This objection is put on the ground that there was written evidence showing with whom the contract was made, which could not be controlled by parol testimony. But this is an error. The entry in the vendors' books did not constitute a written contract. *James* v. *Spaulding*, 4 Gray, 452. It was not even legal evidence of the sale. Certainly the bill of parcels delivered to the defendant cannot be deemed such a contract so as to exclude oral evidence. *Hazard* v. *Loring*, 10 Cush. 267. Besides ; the making of such bill is perfectly consistent with the idea that credit was given to persons other than the defendant. Nothing is more common among business men than the issuing of bills in the name of an agent or broker, in cases where a sale is in fact made to a principal. The same is true of the orders for a delivery of the merchandise. These might well be made out to the broker in order to enable him to forward the goods to the supposed principal, and were wholly distinct from and independent of the contract of sale in pursuance of which they were made. We are strongly inclined to the opinion that if there had been a written contract between the vendors and the defendant for the sale of the linseed, it would have been competent to show by parol evidence that the sale was made in fact to an undisclosed principal, and that credit was really given to the latter, unless it clearly appeared by express stipulation that the agent was to be liable to the exoneration of the principal. *Higgins* v. *Senior*, 8 M. & W. 834. *Huntington* v. *Knox*, 7 Cush. 371. *Bray* v. *Kettell*, 1 Allen, 80, and cases cited. But however this may be, we cannot doubt that in the present case, where there was no written contract of sale, testimony of one of the vendors was properly admitted to

show to whom he gave credit in the transaction, and that it was rightly submitted to the jury to determine on the whole evidence, including the entries on the books and the other documents in evidence, whether the sale was on the credit of the defendant or that of the undisclosed parties in New York. And it may be added in this connection that, in the aspect which the case assumed on the evidence, it would have been erroneous to withdraw it from the jury by a peremptory ruling that there was in law a sale of the merchandise to the defendant, or a legal presumption of such sale, which there was no sufficient evidence in the case to control or overcome. This would have been, under the circumstances, a direct invasion of the province of the jury, by withholding from them the clear and explicit evidence of Barnard, of whose credibility they were the exclusive judges. Nor are we able to see that the facts disclosed concerning the sale, taken together, are absolutely inconsistent with the theory that the sale was made to persons in New York, and not to the defendant. The prominent circumstance on which the counsel for the defendant put this part of the case — that it appeared by the testimony of Mr. Barnard that the defendant was to obtain the notes of the persons in New York for the price of the linseed and get them discounted and pass the proceeds over to the vendors — is by no means decisive of the character of the transaction. He might well undertake to do this as an agent or broker, without becoming the purchaser of the merchandise or receiving it from the vendors on his own credit. The instructions to the jury on this point, as well as on other parts of the case, were clear and intelligible, and properly left to their determination a pure question of fact.

4. We next come to the consideration of an exception on which great stress has been laid by the learned counsel for the defendant. It is founded on the admission of evidence to prove that at the time of making the alleged false representations the defendant was deeply insolvent. This fact was offered in proof by the government as tending to show the fraudulent intent of the defendant in making such false statements, and was held by the court to be competent for that purpose. It is doubtless true

that in a large class of cases the poverty or pecuniary embarrassments of a party accused of crime cannot be shown as substantive evidence of his guilt. The reason for the exclusion of such evidence is, that in those cases there is no certain or known connection between the facts offered to be proved and the conclusion which is sought to be established by it. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. It does not follow because a man is destitute that he will steal, or that when embarrassed with debt and incapable of meeting his engagements he will commit forgery. The conclusion in such cases is too remote and uncertain a deduction to be legitimately drawn from the premises. It is sometimes difficult to mark with precision the line which separates the limits of just and reasonable inference from those of mere conjecture or surmise. This arises necessarily from the nature of indirect evidence. Being founded on the observation and experience of the mutual connection between facts and circumstances, the question of its competency is easy or difficult of solution according as such supposed connection is constant or more or less regular and frequent. But as a safe practical rule it may be laid down that in no case is evidence to be excluded of any fact or circumstance connected with the principal transaction, from which an inference as to the truth of a disputed fact can reasonably be made. This rule is especially applicable when it becomes necessary to show a particular intent in a party as an essential ingredient in the crime with which he is charged. The internal and invisible act or resolution of the mind can be ascertained and judged only by external and visible acts, and by those circumstances which surround a party, and of which he has knowledge when an alleged criminal act is committed. It is upon this ground that in a certain class of crimes evidence that a party has recently committed another offence similar to the one with which he stands charged is held to be admissible. Such evidence is competent in the trial of indictments for uttering forged instruments, passing counterfeit money and receiving stolen goods. Although

the admission of this species of evidence might seem to be a violation of the cardinal principle that proof of the commission of one crime cannot be offered to support a charge of another offence by the same person, it is nevertheless deemed to be competent from the necessity of the case, for the purpose of showing a guilty knowledge and intention. Limited strictly to this purpose, other criminal acts have a direct relation to the particular accusation under investigation, and tend to prove the substance of the issue, because they show the state of the mind of the accused in committing the act with which he is charged. The application of this principle has been extended by this court to cases of obtaining goods by false pretences; *Commonwealth* v. *Eastman*, 1 Cush. 216 ; and to the crime of embezzlement; *Commonwealth* v. *Tuckerman*, 10 Gray, 173, 197. In the latter case, it was said by the court that, when the intent of the accused party forms any part of the matter in issue, evidence of other facts not in issue may always be given, provided they tend to establish the intent imputed to him in committing the act. These decisions show that, where the intent of a party charged with crime is to be proved, a wider range of evidence is permitted than is allowed in support of other issues. And this from the necessity of the case ; because otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged, in which the very gist of the offence may consist. Indeed it may be said generally, that when an act or transaction is of an equivocal kind — one that is not obviously unlawful, from which the *malus animus* cannot be absolutely presumed, but which may be innocent or guilty according to the intent — not only the acts and conduct of the guilty party on other occasions may be shown, but also the circumstances which surrounded him and the facts affecting his condition may be proved, in order to show the intent with which the alleged criminal act was committed. If it be asked what limit is to be placed on the range of such an inquiry, the answer is obvious. It cannot be extended to facts or circumstances which do not naturally or necessarily bear on the issue to be established, precisely as evidence of all collateral facts and circumstances must be confined

to the proof of those which have a legitimate and direct connection with the principal transaction. If these views are correct, and we cannot doubt that they are, there is no room for question as to the correctness of the ruling of the court in admitting evidence of the defendant's insolvency. The making of a false pretence or representation is not of itself criminal. It becomes so only by being accompanied with a fraudulent intent. In the words of the statute, Gen. Sts. *c.* 161, § 54, it must be made " designedly, and with intent to defraud." This intent is part of the substance of the issue, and must be proved. How ? According to the nature of the transaction in or about which the false pretence or representation has been made. If it is a case where such pretence has been used in making a contract for the purchase of goods, and the possession has been thereby obtained from the rightful owner, it is essential to show that the party obtaining them did not intend or was not able to pay for them ; that is, that he intended to get the goods into his possession by a false pretence, for the purpose of defrauding the vendor of the price. The inability of the person making the false pretence to pay for the goods which he has received becomes a significant circumstance bearing on his intent, and tends to show that the pretence, which otherwise would be innocent or harmless, was made for the purpose of accomplishing a fraud. The insolvency of the party has a direct tendency to show the intent with which the false pretence was used. Indeed it is evidence of a most stringent and satisfactory character. The law presumes that every man intends the natural and necessary consequence of his acts. If a person by means of falsehood, under the guise of a purchase either for himself or a third person, obtains the property of another, which he converts to his own use, it is clear that whether the possession thus given is a responsible or irresponsible possession — that is, a possession which will subject the owner to a loss of the value of his property, or one that leaves him secure for its price — becomes a vital question in determining the intent of the party in obtaining the property. If at the time of the transaction he was deeply insolvent, and was cognizant of his condition, the necessary consequence of the act was

to deprive the vendor of his property without recompense or the chance of payment, and leads to the just and almost unavoidable inference that it was done with an intent to defraud. Evidence of the pecuniary condition of the accused in such a case is not offered to show that he was under a peculiar temptation to commit the offence, or was more likely to cheat and defraud because he was in embarrassed circumstances, but for the purpose of showing the natural and necessary consequence of his act, which the law presumes he intended. The distinction between the motives which impel a man to commit an act and the effect which he intends his act shall produce on a third party is clear and obvious. Poverty or pecuniary embarrassment may be incompetent to prove the former, but direct and forcible evidence of the latter.

It was conceded by the learned counsel for the defendant, as we understood the argument, that if the false pretences alleged had been concerning the pecuniary responsibility of the defendant, in order to procure a sale of merchandise to himself, the evidence of his insolvency would have been competent. This concession seems to us to give up the point. Such evidence doubtless would have been admissible, not only to prove the falsity of the pretence, but also the fraudulent intent. It has often been so applied in the courts of this commonwealth. But we can see no essential difference between such a case and the one at bar. In either case, the same fact is offered to prove the same intent. The nature of the false pretence is quite immaterial. The real point of inquiry is, did the party by means of it obtain possession of property with intent to defraud, and this is shown with like force and effect by evidence of his insolvency and inability to pay, whether the goods were procured by a false pretence of agency for responsible parties or of his own pecuniary responsibility. For this reason, without enlarging further on the point, it seems to us that the evidence objected to was clearly competent, and had a direct tendency to prove a material issue in the case.

5. It is further objected, in behalf of the defendant, that there are fatal variances between the allegations in the indictment

and the evidence offered in their support. The first one insisted on is, that the evidence of Barnard does not sustain the aver· ment in the first count, that the defendant represented falsely that he had an order to purchase the linseed at three dollars per bushel. But this is rather a criticism on the testimony of the prosecutor than an absolute variance between allegation and proof. The representation actually made fairly implied an authority to purchase at the price alleged, and well warranted the jury in finding that it was proved as laid. A second variance in the same count is supposed to exist between the allegation and proof of the inducement of the prosecutors to part with their property. But this, like the former, is founded on an ingenious and plausible construction of the evidence given by Mr. Barnard, but does not amount to a variance. Undoubtedly in a certain sense the expectation of receiving the stipulated price for the linseed from the persons in New York for whom the defendant purported to act, and to whom credit was given by the prosecutors, was an inducement by which they were led to part with the possession of their property. The expectation of receiving payment is a motive for every sale of property. But it is always made up of various elements, and is the result rather of other inducements which have produced the expectation than an inducement itself. This is very clearly the sense in which the testimony of Barnard is to be understood, and it was so interpreted by the jury. It was the false pretences made by the defendant, as set out in the indictment, which created the expectation and caused the prosecutors to part with their property. This is the only fair and legitimate inference from the whole testimony of Barnard, and thus understood it well supports the averment in the indictment. As to the first count, therefore, we are of opinion that the supposed variances between the allegations and proof do not exist.

An additional ground of variance as to the second count is insisted on, which seems to us to be well taken. In regard to the lot of linseed therein specified, it does not appear that in making the negotiation for its purchase the defendant purported to act in behalf of parties in New York. The interview

between Mr. Barnard and the defendant concerning the alleged purchase of the lot was had at a time subsequent to that in which the transaction set out in the first count took place. Nor did the defendant in this second interview pretend that he was acting for the same parties on whose account he purported to act in making the previous negotiation. On the contrary, he expressly stated that he had an order from "another party." He did not state who he was or in what place he resided. It would have been perfectly consistent with his statement or representation, if he had been employed to make the purchase by a person in Boston, or Portland, or elsewhere. This evidence therefore does not support the allegation that the defendant represented to the prosecutors that he was acting for parties in New York, or the averment of the inducement as set out in the second count. In this respect there was a fatal variance, and the verdict on this count cannot be sustained. *Rex* v. *Plestow*, 1 Camp. 494. *The Queen* v. *Ward*, 1 Cox C. C. 101.

It only remains for us to dispose of the motion in arrest of judgment on the first count. This rests substantially on two grounds.

The first is, that the indictment charges the several acts constituting the offence to have been committed by the defendant in his "capacity as a merchandise broker." This is certainly an unusual and extraordinary allegation; but we think the maxim, *Utile per inutile non vitiatur*, is applicable to it. Inasmuch as a man cannot ordinarily commit a crime in any particular capacity or in the exercise of any special occupation, it does not change or in any way affect the nature of the charge to aver that when he was committing it he purported or claimed to act, or actually did act, in a specific capacity, or by virtue of a certain employment. An allegation in due form that a person committed an assault and battery would not be vitiated by the addition of an allegation that he did it as a constable, nor would an averment in technical language that a defendant had committed larceny be rendered nugatory or insufficient by an additional allegation that he committed the act in his capacity as a common carrier. The rule of law as to matters which may be

treated as surplusage is clear, intelligible and consonant with good sense. It is this: When, in addition to facts which are essential to the charge, others are alleged which are wholly redundant and useless, the latter may be wholly disregarded. As the law does not require the superfluous circumstances to be alleged, so, although they have been improvidently stated, the law, in furtherance of its object, will reject them as mere surplusage, and will no more regard them than if they had not been alleged at all. 1 Stark. Ev. (4th Amer. ed.) 372. The words in the indictment on which this ground of arrest of judgment is founded clearly fall within this principle. The same is true of the subsequent allegation in the same count, that the defendant received and obtained possession of the property in his capacity as a merchandise broker. This is a wholly immaterial averment. The offence which the statute aims to prevent is the obtaining of property by false pretences with an intent to defraud the owner thereof. A possession so obtained is criminal by whomsoever it is accomplished.

The remaining ground on which it is claimed that the indictment is defective and insufficient to support a judgment is, that it avers an actual sale of merchandise to parties in New York, effected by the defendant as their broker, and a delivery of it in pursuance of such sale to him as such broker, and a reception and possession of it by him in that capacity. But this statement of the averments is contrary to the whole scheme and scope of the indictment. It is nowhere averred that the defendant was the broker or agent or authorized to act in any way in behalf of the parties in New York. The contrary is distinctly averred, and forms the basis of the false pretence by which the prosecutors are alleged to have been induced to deliver their property to the defendant. Assuming all the averments in the indictment to be true, there could be no sale of property to the parties in New York effected through the agency or intervention of the defendant. All authority in him to act as their broker or agent is distinctly negatived. Taking the averments together, as descriptive of one single transaction which they are designed to set out, they do not allege a real sale to the parties in New

York through the defendant as their broker, but only a contract of sale on the part of the prosecutors, induced by false pretences made by the defendant by means of which he fraudulently obtained possession of their property. This is the legal effect of all the averments.

The result is, that the verdict on the second count, having been rendered on evidence which did not support the allegations, must be set aside. The exceptions and motions in arrest, so far as they apply to the first count, are overruled; and if the attorney general shall see fit to enter a *nol. pros.* on the second count, the case will stand for judgment on the first count only.