(No. 19078.—

The People of the State of Illinois, Defendant in Error, *vs.* James Ball *et al.* Plaintiffs in Error.

*Opinion filed December 20, 1928.*

CARL E. ROBINSON, and BARNABAS F. SEARS, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, HUGH GREEN, State's Attorney, and ROYCE A. KIDDER, for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

In the circuit court of Morgan county plaintiffs in error, James Ball and John Meline, were indicted, tried and convicted of the larceny of an automobile of the value of $1000, the property of Helen Clark, and were each sentenced to an indeterminate term in the Southern Illinois Penitentiary at Chester. To review the record of their conviction plaintiffs in error have sued out a writ of error from this court.

The evidence shows that about seven o'clock in the evening of January 25, 1928, Helen Clark parked her car near the Illinois Theatre, in Jacksonville, went into the theatre and remained there until about nine P. M., at which time she found that her car had been taken. She regained it twelve days later at Dwight, Illinois. Evidence was introduced showing that plaintiffs in error were in possession of the car on the night of January 25 on the highway between Jacksonville and Dwight. At Pontiac they attempted to trade a blanket which was in the car, and a spare tire, for gasoline, but as the garage keeper would not take the blanket and as the tire was locked upon the carrier and they did not have the key to unlock it, they were unable to trade. They then drove to Dwight, where they abandoned the car.

Ball testified: "On the evening of January 25 of this year John Meline and I got a car here in town parked by the opera house. As we walked by the car I first noticed

the keys in it. The car was facing north, and we got into it and went down to Douglas avenue and then down to Meline's house, in the east part of town, on Douglas avenue. He went in and put on a wool shirt. We went out Hardin avenue to the hard road and went eastward, stopping first at Alexander. We got some gasoline at the Weigand station and then went on toward Springfield. We had decided to go to Springfield because my wife was there, but we went on through Springfield up toward Dwight, intending to go to Chicago for a couple of days. I have a brother and a sister there. Meline was driving. We stopped at Pontiac at a garage to get gasoline but did not get anything. We were out of money and wanted to give the man a check for a day or two and let him hold it and we would take it up when we came back. He said he was not allowed to take any checks. I asked him if he would take a blanket, and he said no. There was a blanket in the car. He wondered if we had anything better than a blanket to leave. I asked Meline to leave his overcoat, and he said no; it was too cold. There was a man sitting inside, asleep. He was the police officer who testified here. He was asleep when we went inside to get a bottle of pop. We got started and he came out and hallooed after us, but we kept on going. We got up as far as Dwight and a motorcycle and a car were parked there. I told Meline that I believed they were the police. As we went they started to follow us, but we went on a little faster. We pulled away from them and came around the corner and got out of the car and left it. We left the car off the hard road about the length of this room. We left the keys in the car and the license plates on it. We were only intending to go to Chicago and drive the car nearly all the way back. We did not try to sell the car to anybody, and at the time we took it and during the time we had it we did not intend to keep it permanently. We were merely using it to get somewhere. We were going to Springfield to look for my wife. I did not know exactly

where she was stopping. We did not know whose car it was. I never gave it a thought. There was a blanket in the car. I do not know what became of it. I do not know whether it was in the car when the car was recovered. We got out of the car fast. I never gave the keys a thought. We got to Jacksonville the next day. We were arrested two or three days afterwards, and then we learned that the car belonged to Miss Helen Clark."

Meline testified: "I recall taking the car with Ball from the opera house block about 8:30 or 9:00 o'clock in the evening. I did the driving. We went down to Douglas avenue and turned east on Douglas toward my house and stopped in front. It was chilly that evening and I stopped to get a heavier shirt. When we started we were intending to go to Springfield. We went out on Hardin avenue to the Springfield road and then east. We first stopped at the filling station at Alexander to get gasoline. The next stop was when we got in the ditch the other side of Bates. It was a mile or so the other side of Bates, on the hard road. The witness who testified here, John O'Brien, came along in a Nash sedan with another young fellow named Davis and some girls. I told them we were in the ditch and asked them to give us a lift, and they said they did not have any rope or anything, and I didn't either. They could not help us and went on. I recognized Davis and O'Brien. Another car came along and helped us out of the ditch. I did not know who they were. We went from there on to Springfield and through Springfield and headed toward Bloomington and Pontiac. We stopped at a garage at Pontiac to see about gasoline. We did not have any money to get gasoline with, and we went on from there toward Dwight. We crossed the railroad and were a block or two on the other side and a car and motorcycle were at one side of the road, and Ball said that he thought they were the police and I said that I thought they were. We started a little faster and they started behind us. We went down

the hard road and turned off onto a side street, and I jumped out on one side and he jumped out on the other. We left the keys in the car. The car was about a half block off the hard road, in the city of Dwight. At the time we took the car we did not intend to deprive the owner of it. We did not try to sell it to anybody. We were just riding and intended to bring it back. We did not know at the time whose car it was. After we left Springfield we started for Chicago. I have a brother there named Harry Meline. He lived there all the time. After we left Chicago to come back we were going to drive the car back as far as we could and leave it. We went into Springfield on Laurel avenue. We went right straight on through Springfield and did not spend much time looking for Ball's wife. He did not know exactly where to look. He thought it was best not to go around up-town. He did not talk much about it. At Dwight, Ball mentioned that the police was there. We did not spend much time in Springfield waiting for Ball's wife. He indicated to me that he was going there to see his wife, but we went on. We did not have money to get gasoline at Pontiac. We had a blanket in the car and were going to leave that but the man would not take it. He wanted me to leave my overcoat, but at that time it was a little chilly for that. We did not get any gasoline. Nothing was said about the spare tire for gasoline. I said nothing about it, neither did Ball that I heard. I did not pay any attention to the officer shouting at me. I don't know whether he did or not. The motorcycle and the automobile chased us and we stepped on the gas and the Chrysler stepped from them a little. We turned off the hard road on a side road and left the car in a hurry. Ball got out on one side and I got out on the other. We did not take the keys. We did not say anything to the officers there about an innocent ride. I went through some yard. He went one way and I the other. I do not know where exactly. I did not go to the officers there and tell them this car was just borrowed."

It is contended by plaintiffs in error that it was error for the court to overrule their motion in arrest of judgment for the reason that the record failed to show that the indictment was returned in open court. A diminution of the record was suggested and motion made for leave to file an additional transcript of the record, and by leave of this court the same was filed herein. This latter record shows that the grand jury was duly summoned and called and that the court appointed one of their number foreman, and that the foreman and the remaining grand jurors were duly sworn and were instructed by the court as to their duties and retired to consider of their presentments. This record also shows that the grand jury came into open court and through their foreman presented the indictment, which was endorsed by the foreman a true bill and made a part of the record. Errors assigned in a criminal case on the basis of an imperfect record are not available where the true record has subsequently been brought up and the errors do not apply to it. *Sullivan* v. *People,* 156 Ill. 94; *Nagel* v. *People,* 229 id. 598.

It is contended by plaintiffs in error that the court admitted improper evidence on their cross-examination. They had testified that in taking the automobile they did not intend to deprive the owner of it permanently, but were intending, after using it, to drive the car back as far as they could and then leave it. On cross-examination they were asked if they did not see Helen Clark at their preliminary examination, (which was prior to the time when she ascertained the whereabouts of the car,) and whether at that time or at any other time they informed her as to where her car could be found. They were not asked as to whether they testified at the preliminary hearing. The examination was proper as tending to impeach their direct testimony as to their intent.

It is contended by plaintiffs in error that the court committed error in giving certain instructions for and on behalf

of the People and refusing certain instructions offered for and on behalf of plaintiffs in error, in view of the character and nature of the defense in this case. The abstract presented by them on this writ of error does not show that the instructions given for the People and for plaintiffs in error were all the instructions that were given on the trial. The refusal of certain instructions cannot be considered as a matter affecting the judgment where the abstract does not show that the instructions included therein were all the instructions given at the trial. (*People* v. *Adams*, 289 Ill. 339; *People* v. *Allegretti*, 291 id. 364.) We have, however, examined the eight refused instructions which plaintiffs in error claim should have been given. Nearly every one of these instructions is such that its refusal would have been error had it been the only instruction offered on the subject. However, where a defendant offers several instructions on the same subject he has no ground for complaint when proper instructions are given covering the entire law of the case, even though the court, in making its selection, does not give the instructions which defendant would have preferred. In the instant case the principle of law contained in each of the refused instructions was fully covered by other instructions given at the request of plaintiffs in error.

Complaint is made of two instructions given at the instance of the State's attorney. The first of these instructions informed the jury that the State's attorney had entered a *nolle pros.* as to the third and fourth counts of the indictment and stated separately the averments contained in the first and second counts, and concluded: "that if from all of the evidence in the case you believe beyond a reasonable doubt that the defendants James Ball and John Meline, feloniously, in manner and form as charged in the indictment in the first or second count thereof, did take, steal and carry away the automobile described in the indictment in manner and form as therein alleged or either said first or second count thereof, you should find the defendants guilty."

The other instruction complained of was a statement, in other language, of the concluding part of the first. The first instruction was very properly given. The second could properly have been refused as being a repetition of the one already given, but giving it was not reversible error.

It is contended by plaintiffs in error that the court erred in allowing the jury, over the objections of the plaintiffs in error, to take the indictment to the jury room when they retired to consider their verdict. A *nolle prosequi* having been entered as to the third and fourth counts the court should not have allowed the indictment to be taken by the jury to the jury room, but as the court had instructed the jury that these counts were not before them for their consideration, plaintiffs in error could not have been prejudiced thereby.

It is contended by plaintiffs in error that the State's attorney committed reversible error in his argument to the jury in commenting on the fact that plaintiffs in error did not testify at the preliminary hearing. The record does not show that the State's attorney stated that plaintiffs in error did not testify at the preliminary examination. The court sustained an objection to his statement that at the preliminary examination plaintiffs in error remained silent when confronted with the complaining witness.

It is contended by plaintiffs in error that the court erred in not allowing counsel for plaintiffs in error to state to the jury the ultimate facts upon which a decision of this court was based. It is only proper to read to the jury decisions of the Supreme Court of this State or decisions of other courts of last resort or opinions from approved text books, where the decisions from other States and the law announced in the text books are not in conflict with the established law of this State. (*Wohlford v. People,* 148 Ill. 296.) The trial court is not obliged to allow the reading of numerous authorities to the jury or the unnecessary consumption of public time in discussing to the jury such au-

thorities. The court has a clear right to keep the reading of law to the jury within reasonable limits. (1 Thompson on Trials,—2d ed.—sec. 946; 16 Corpus Juris, 912.) The general rule is that counsel may read extracts from the opinions in reported cases bearing upon the law of the case but not the facts in the opinions.

Lastly, it is contended by plaintiffs in error that the felonious intent essential to the crime of larceny was not proven beyond a reasonable doubt. Were all the other evidence in the case discarded, a consideration of the testimony of plaintiffs in error alone would lead to the conclusion that the jury could not reasonably have found a verdict other than the one which they did.

Finding no reversible error in the record the judgment of the circuit court is affirmed.

*Judgment affirmed.*