(No. 20893.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARL TERRACCO, Plaintiff in Error.

*Opinion filed December 17, 1931.*

EDWARD MAHER, (GEORGE A. GORDON, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff in error, Carl Terracco, jointly indicted with Carl Stepina, Dave Taddeo and George Raymond, was convicted in the criminal court of Cook county of robbery

while armed with a dangerous weapon. He was sentenced to the Joliet Penitentiary, where he is now confined, and has sued out this writ of error.

On the morning of August 21, 1928, the cashier of the Service State Bank of Chicago directed the bank's messenger, Ole Pederson, to take a package of money, amounting to over $18,000, in a brief case or satchel down-town to the Union State Bank. Pederson, accompanied by Thomas Meany, a guard, entered a Yellow cab and started down town. While on the way the cab was forced to the curb by a large greenish-blue Cadillac with wire wheels and brought to a stop. Three men jumped out of the Cadillac and covered the occupants of the cab with guns. One man grabbed the brief case and threw it into the Cadillac car.

The robbers jumped into the machine and sped away. The crime was committed around 11:00 o'clock in the morning. Between 2:00 o'clock and 3:00 o'clock of that morning two men entered the Albany Park Garage and one of them asked the attendant, DeVries, for some gas, and as they walked toward the tank the men took DeVries by the arm and led him to a wall. One of them was pressing something against DeVries' back and said, "You stand there; don't move." The instruction was obeyed, and a little later DeVries heard a car being started and was again warned not to move. After the car was driven out of the garage DeVries discovered the men had stolen a greenish-blue Cadillac sedan with wire wheels. The car was recovered that evening abandoned in Melrose Park and delivered to its owner. In the meantime Terracco and Taddeo were arrested and identified by DeVries as the men who took the Cadillac. His identification was made within eight hours after the car was taken.

The driver of the Yellow cab which conveyed the messenger and guard, testified that when he was forced into the curb three masked men jumped out of the Cadillac and one of them put a sawed-off shot-gun in his face; that

there was left in the Cadillac a driver and another man in one of the rear seats; that the man in the rear wore a torn cap with a blue lining hanging down, which served as a mask, and that this man had a peculiar gun which he pointed toward the occupants of the Yellow cab. The witness was shown a cap and also a gun which were in evidence, and identified them as being similar to the cap and gun he had seen at the robbery.

The messenger, Pederson, testified that for a week or two preceding the day of the robbery he had seen the defendant Taddeo around the bank four or five times. He stated that he was able to identify the cap because of its torn condition and the way the blue lining hung down.

Charles Kobwitz, a police sergeant of Melrose Park, who had known both Terracco and Taddeo for a number of years, testified that at 12:05 o'clock, noon, on August 21, 1928, Terracco went by him seated in the rear of a greenish-blue Cadillac and was going south on Eleventh avenue. Terracco waved at the witness and his salute was returned. There were other men in the car, but the officer did not observe who they were.

Wayne Luce, also a police officer of Melrose Park, testified he was well acquainted with Terracco and Taddeo and saw them riding together in a blue Cadillac sedan with wire wheels on Twenty-second avenue between 11:45 o'clock A. M. and noon of August 21, 1928, and that there were five men in the car.

Officer Conklin and his wife were in the Buick sales department in Oak Park to have their car checked over, and Conklin testified he saw Terracco and Taddeo there between 1:00 o'clock and 2:00 o'clock P. M.

Police officers Sullivan, Kusack and Pieske, at 1:35 o'clock on the afternoon of August 21, 1928, drove to the home of Terracco, at 115 North Fifteenth avenue, Melrose Park. Taddeo was in front of the home at work on his own car and was placed under arrest. Officers Kusack and

Pieske entered Terracco's home from the front and Sullivan went to the rear, where he met Terracco in a passageway, leaving the house. In one hand Terracco had something wrapped in paper and in the other hand a paper bag. He was ordered to throw up his hands and in obeying dropped his bundles. In the package wrapped in paper was a sawed-off shot-gun. The paper bag contained two loaded automatic pistols, one of which was a German Lueger. These guns were offered in evidence, and the German Lueger was identified as being similar to the one held by the man in the rear of the Cadillac at the scene of the robbery. After the arrest the police officers made a search of Terracco's home and found a cap, which was offered in evidence and marked "Exhibit 2." It is the cap which was identified as having been worn by the occupant in the rear of the Cadillac.

Plaintiff in error's defense was chiefly an alibi. He testified that he was a married man living with his family; that he had never been in trouble before; that he was engaged in trucking stone and other materials and also conducted a saloon in Melrose Park; that on the night previous to the robbery he was in his place of business until 10:30 o'clock, when he closed and went to a public garage, where he spent about an hour; that in company with two or three other men he went to Carras' restaurant at 1:00 o'clock A. M., where he had something to eat and remained until 5:30 o'clock on the morning of August 21; that he saw Tony, the waiter, police sergeant Boni, Dominick Rego, and four or five other men; that Rego came to the place several times during that night; that when he left the restaurant he went home to bed; that he got up about 9:00 o'clock or 9:30 o'clock A. M. and walked to the home of Andrew DeGrazia, whom he asked to drive him to the Oak Park Buick Salesroom, where he had an automobile for repair; that DeGrazia drove him there in a greenish-blue Buick, arriving about 10:30 or 11:00 o'clock

in the morning; that they stayed ten or fifteen minutes, talking to the service manager, Guarine; that his car was not ready and DeGrazia drove him back to the saloon, arriving after 11 :00 o'clock; that he and DeGrazia went back again to the Oak Park Buick Salesroom shortly after noon; that on the way there they passed officer Kobwitz at Eleventh avenue, who waved at him; that after they reached the salesroom he told DeGrazia to go on home, as he would have his own car in which to return; that, however, he did not get his car because the repairs were not complete; that he saw at the salesroom officer Conklin and his wife, and also a salesman by the name of Walker; that he stayed until almost 2 :00 o'clock, when the service manager had someone drive him to his saloon; that he was not in an automobile any time during the day with Stepina or Taddeo nor did he at any time ride in a Cadillac car; that when he arrived at his home he went into his basement, because he had been informed during the morning that Angelo Maretta would leave some packages in his house; that he knew Maretta ran a few stills and delivered alcohol; that Maretta told him he would leave the packages there because things were "hot" and he expected a raid; that when he found the packages he did not inspect them, but immediately carried them out and while doing so he was arrested, and that he did not know the packages contained guns. Plaintiff in error further testified that he never saw Stepina until the morning of August 21 at the detective bureau; that he did not see Taddeo on the night of August 20 or during the day of August 21; that he did not go with Taddeo or anyone else to the Montrose Avenue Garage and steal a Cadillac car, and that he did not participate in or have any knowledge of the robbery of Pederson, the messenger of the Service State Bank.

Dominick Rego, a watchman, Tony Bougas, the waiter, and James Borogne, a motorcycle officer, testified to having

seen plaintiff in error in Carras' restaurant at various times ranging from 1:00 A. M. to 6:00 A. M., on August 21.

Andrew DeGrazia testified that he was the owner of a cigar store in Melrose Park, and that Terracco came to his house about 10:00 o'clock in the morning of August 21 and asked to be driven to the Oak Park Buick Salesroom. DeGrazia consented, and says they arrived at the salesroom about 10:30 o'clock in the morning and stayed there fifteen or twenty minutes, when he drove Terracco back to the saloon. He corroborated Terracco's testimony about the second trip, except that he placed the time at about 1:00 o'clock instead of 12:00 o'clock, as stated by Terracco. He also testified to passing officer Kobwitz at a stop light on Eleventh avenue, but fixes the time at 1:30 o'clock, whereas Kobwitz testified that Terracco passed him at 12:05 o'clock in a Cadillac car, and that he never saw Terracco and DeGrazia in a Buick car at 1:30 o'clock.

Albert M. Walker, a salesman at the Oak Park Buick Salesroom, testified that Terracco was at the salesroom between 12:00 o'clock and 12:30 o'clock alone. George Moline, another salesman, testified that Terracco was alone in the salesroom between noon and 1:00 o'clock, and that Terracco had also been there at 11:00 o'clock in the morning. James J. Guarine, shop foreman, testified that Terracco was in the salesroom between 10:00 and 11:00 o'clock in the morning and again between 1:00 o'clock and 2:00 o'clock in the afternoon, and that he did not see Stepina or Taddeo.

Taddeo, one of the defendants, testified he was an employee of the Sanitary District of Chicago; that he did not arise on the morning of August 21 until 9:00 o'clock, when he was called by Joseph Salinardi; that he went to a drug store about 9:30 o'clock to get a bottle of medicine; that thereafter he proceeded with Tony Vercillo to the sanitary district office about 11:00 o'clock; that he stayed at the office a half hour and saw Trapanese and DeMichaels; that he then went with Vercillo to Larocco's confectionery store,

about two miles away, and while there saw Peter DiFrancesca; that he again went to the sanitary district office to see Higgins and left about 1:45 P. M.; that in going home he picked up Terracco, who lived across the street from him; that their arrest was made shortly afterwards; that he did not see Terracco at any other time during the day; that he did not know Stepina and was never in a Cadillac car with either Stepina or Terracco, and that he did not participate in the stealing of the Cadillac car and was not at the garage at the time it was stolen.

Frank Marsicano testified that Taddeo came to his drug store about 10:30 o'clock A. M. to get a prescription filled; that he was there but a few minutes, and that he did not see him any more during the day.

Larocco testified that Taddeo was in his confectionery between 10:00 o'clock and 11:00 o'clock A. M. Anthony Vercillo testified that he was with Taddeo at Larocco's place at 10:30 o'clock A. M. and went with him to the sanitary district office about 11:00 o'clock, and that they were there for about a half hour. DiFrancesca, DeMichaels and Trapanese testified that they saw Taddeo at the sanitary district office between 11:00 o'clock and noon. Harold J. Higgins fixed the time he saw Taddeo at the sanitary district office at 1:00 o'clock in the afternoon.

While Taddeo's case is not here for review, the testimony concerning his whereabouts during the day must be considered in connection with the positive identification of Terracco and Taddeo by DeVries as the men who stole the Cadillac car from the Albany Park Garage. Inasmuch as the men who participated in the robbery of Pederson had masks over their faces and were not identified by any witness, the proof against Terracco rests upon circumstantial evidence. It is claimed by plaintiff in error that the circumstances relied upon by the State are too vague and indefinite to warrant a conviction.

The robbery of Pederson is an undisputed fact. It was committed by persons who were riding in a greenish-blue Cadillac automobile. The guilty parties were armed with a sawed-off shot-gun and pistols. One of the robbers wore a torn cap with a blue lining so drawn as to shield his face. He was seated in the rear of the car and held a German Lueger gun. When Terracco was arrested he was in possession of a pistol of that description and a cap was found in his home which was identified as being similar to that worn by one of the robbers. Two witnesses testified to having seen him in the rear seat of a greenish-blue Cadillac not far from the time when the robbery was committed. The Cadillac car was stolen early in the morning and was found abandoned the next evening. It tallied with the description of the car used in the robbery. Terracco was identified as one of the men who stole it and according to the evidence he was seen riding in it shortly after the robbery, and it would do violence to ordinary credulity to assert that he was not in it at the time of the robbery, particularly in view of the testimony in reference to the cap and the German Lueger gun.

The defense of alibi was fairly presented to the jury, which had an opportunity of seeing the witnesses and giving their testimony the weight and credit to which it was entitled. In a criminal case the court will reverse a judgment of conviction where the proof does not show that the defendant is guilty beyond a reasonable doubt. (*People* v. *Thompson,* 321 Ill. 594; *People* v. *Herbert,* 340 id. 320.) However, in this case the jury was justified in accepting the testimony of the People's witnesses rather than that of the defendant's witnesses and in returning the verdict it did.

The trial court instructed the jury that before the defendant can avail himself of the defense of an alibi the proof must cover the whole of the time of the commission of the crime, so as to render it highly improbable, if not impossible, that the defendant could have committed the

act.  Whether this instruction is correct or erroneous depends upon the facts in the particular case.  It has been held to be erroneous where, under the proof, the instruction may be deemed an intimation by the court that there was a doubt as to the sufficiency of the alibi.  (*People* v. *Lacey,* 339 Ill. 480.)  The rule thus invoked can only apply to cases where there is no conflict as to whether or not the proof relative to the alibi covered the whole of the time.  Where, however, there is a conflict on this question the instruction is a proper one.  (*People* v. *Becker,* 340 Ill. 426.)  The testimony of defendant's witnesses concerning the alibi is indefinite and uncertain as to where Terracco was at all times between 10:30 o'clock and 11:30 o'clock A. M.  There is a serious question whether their testimony covered the whole of the time.  With the record in that condition the court properly gave the instruction.

Under the evidence Terracco was a principal and not an accessory, and the court should not have given an instruction concerning an accessory.  However, no possible harm could come to the plaintiff in error by reason of this error.  *People* v. *Jordan,* 303 Ill. 316; *People* v. *Pargone,* 327 id. 463.

An instruction tendered by plaintiff in error told the jury that the defendant could not be convicted unless all the essential facts proven were consistent with the hypothesis of guilt.  This instruction did not advise the jury what were the essential facts necessary to warrant a conviction but left the question open to speculation.  The instruction was properly refused.

The plaintiff in error is in no position to complain of the court's action in giving and refusing instructions, because the abstract does not contain all of the given instructions or all of the refused instructions.  *People* v. *Ball,* 333 Ill. 104.

The record discloses no substantial error, and the judgment is affirmed.

*Judgment affirmed.*