PEOPLE *v.* MORGAN.

HOMICIDE—MOTIVE—INFERENCE FROM PROOFS—INSURANCE.

On a prosecution for homicide, where the people claimed that respondent shot at deceased, mistaking him in the darkness for the husband of a woman on whose farm respondent was employed, and whose separation from the husband had been effected after rumors of improper relations with respondent, the court was in error in admitting evidence that the husband's life was insured in favor of the wife for $2,000, upon the theory that the jury might, in the absence of direct testimony, be warranted in drawing an inference—from testimony that the wife knew of the insurance, and that respondent had once jocularly observed that any one who would get rid of the husband would get a thousand dollars—that respondent also knew of the insurance, and that it furnished an inducement for the commission of the crime. MONTGOMERY, C. J., and HOOKER, J., dissenting.

Exceptions before judgment from Cheboygan; Adams, J. Submitted May 1, 1900. Decided July 3, 1900.

Frank Morgan was convicted of murder in the second degree. Reversed.

Respondent was charged with the murder of one Don Gillis on the 29th day of April. He was convicted of murder in the second degree. He was at work as a farm laborer for one Mrs. Bowen. Her husband had left her, and was living in a house upon an adjoining 40 acres. Mrs. Bowen controlled the house and farm where she lived. About 11 o'clock at night Mrs. Bowen's dogs barked in such a manner as to lead her and the respondent to believe that somebody was prowling around the house. She told the respondent to take his revolver, go out upon the stoop, and fire it, to scare the person or persons away. The night was dark and stormy. Respondent went out upon the stoop, and saw, by a flash of lightning, an object three

or four rods from the house, in a stooping posture. He cried out, "Who is there?" and, receiving no response, fired three shots. The next morning the dead body of Gillis was found in the yard. Gillis had climbed over the fence, as was shown by his tracks, and was approaching the house; but for what purpose does not appear, as it was not shown that he had had any difficulty with the respondent or any one in the house. The people claimed that respondent shot and killed Gillis, believing the person to be Mr. Bowen, Mrs. Bowen's husband.

It is urged that respondent had been the cause of Mr. Bowen's separation from his wife, that the relations between her and respondent were criminal, that there had been trouble between Bowen and respondent, and that therefore respondent shot at the person that night, believing him to be Bowen. It was also claimed that there was an insurance policy upon the life of Mr. Bowen, in favor of his wife, and that the purpose of Mrs. Bowen and respondent was to obtain this insurance. There was evidence from the people's witnesses that persons had been prowling around the house before, and that threats had been made to lynch respondent, and that he purchased a revolver for the purpose of defending himself against Bowen. Mr. and Mrs. Bowen had five children, all of whom were then at her home; the oldest one being 15 years of age.

There is no evidence that respondent knew of the insurance policy. Policies had been taken out by Mr. and Mrs. Bowen in the Maccabees, each in favor of the other. His, for her benefit, was for $2,000, and hers, for his benefit, was for $1,000. Mr. Bowen left her the 1st of January previous, and took his policy with him. The continuance of the policy depended upon whether he kept up his assessments. The record is barren of any proof of criminal intimacy between respondent and Mrs. Bowen. Mr. Bowen was a witness, and gave no reason for leaving her, or for having any suspicion against respondent or his wife. There is testimony that he was jealous of her, and did not want respondent to work upon the farm. She went

to the prosecuting attorney, Mr. Frost, and stated the facts to him; saying that her husband was jealous of respondent, but it would be the same if any other man were to work for her. She was a witness for the prosecution, and her testimony in her cross-examination upon this point is as follows:

"I heard rumors of personal violence against Morgan or myself while he was living at my place. I did not communicate any of them to Mr. Morgan. I had no talk in particular about his leaving my place. I remember having a conversation with the prosecuting attorney of this county with reference to my keeping a hired man; I believe, in March. In that conversation I stated to him some objections that I had heard with reference to my having an employé. He told me that if the man did his work properly, and I paid him his wages, to keep him, by all means. I also showed him a letter I had from my husband concerning the matter, and he said it was because he was evidently jealous, and it made no matter what man it was; it would be the same. And, acting upon that suggestion, I still retained Mr. Morgan in my employ."

On her redirect examination she testified:

"I told you there had been threats as to both our lives, and you said that would not make any difference; they were just trying to frighten me, and would not dare to take the law in their own hands."

This statement is not denied, and comes from the people's own witness.

Respondent testified that he once met Mr. Bowen upon the highway, and "Bowen took off his coat, vest, and cap, and said he was going to whip me." He told him he did not want to have any trouble with him, and that he had always thought a good deal of him, and they talked a few minutes, when Bowen put on his clothes, handed respondent a cigar, took one himself, and they both lighted them with one match. This is not contradicted by Bowen, and is the sole evidence of any difficulty between Bowen and respondent. One Hanske testified that one evening respondent, when he was intoxicated,

said, in the presence of several others, " Any man would get a thousand dollars that would get rid of Bowen." The witness said he laughed, and did not think respondent meant it. One other witness who was present testified to this conversation, but his version differs very materially from that given by Hanske. This is the only testimony tending to show any malice against Bowen, or any intent to do him harm. But this is no proof that respondent had reason to believe that the person he saw that night was Bowen. It was essential for the people to prove this. There is an entire absence of any such proof.

*Cross & Roe* and *Halstead & Halstead*, for appellant.

*George E. Frost*, Prosecuting Attorney (*V. D. Sprague*, of counsel ), for the people.

GRANT, J. (*after stating the facts*). 1. I can find no evidence upon this record from which it can reasonably be inferred that the respondent was guilty of murder. Unless the people produced evidence from which it could fairly be inferred that respondent shot, believing that the person in the yard was Bowen, and intended to kill him, the conviction is wrong. This is the claim of the people, and the sole theory on which they asked conviction. There is, in my judgment, no such testimony. The court should, therefore, as requested, have directed the jury to acquit him of the crime of murder.

2. It was error to permit evidence that Mr. Bowen's life was insured. The prosecuting attorney stated that he would connect this evidence with what the prisoner had stated,—that "there was a thousand dollars in it for any one who would do away with Dave Bowen." The court admitted it, stating that, if the connection was not made, it would certainly be immaterial. The prosecution did not show that respondent had any knowledge whatever of this insurance; yet it is evident that this was urged as one of the reasons for his conviction. It is especially important in criminal cases that the proper order for the

admission of testimony be observed.   Knowledge of this insurance on the part of the respondent should have been shown before introducing evidence of the fact of insurance.

Conviction reversed, and new trial ordered.

LONG, J., concurred with GRANT, J.

MONTGOMERY, C. J.    I cannot assent to the conclusion of my Brother GRANT that there was no evidence in this case justifying a verdict of murder in the second degree. If the case of the people rested wholly on the testimony of Mrs. Bowen, the conclusion might be justified; but it does not.    The people called witnesses who testified, in substance, to a statement of respondent that it would be worth $1,000 to one who would make way with Bowen.    There was also testimony to the effect that, at some time before he took his residence at Mrs. Bowen's the last time, he attempted to borrow a revolver, saying he was going over to Bowen's, and that he had heard that Dave (Bowen) was prepared for him, and he wanted to take it in case of any trouble; he wanted to defend himself.    He was advised by the witness to stay away from Bowen's if Mr. Bowen did not want him there.    Another witness testified that he had a conversation with respondent in regard to the talk of lynching him, and that respondent said that there was some jealousy, and, when asked who it was, replied that it was Bowen, and applied an offensive epithet to Bowen.

In the face of this evidence, it seems to me that there was ample basis for the jury to find malice towards Bowen.    When we consider, in connection with this fact, that respondent was living at Bowen's house, which Bowen had left because of his jealousy, and that respondent understood that it was Bowen who threatened him with mob law, is not the inference justifiable that on the fatal night, when respondent claims to have thought that some person bent on doing injury to himself or Mrs. Bowen had invaded the premises, he believed that person to be Bowen,

and acted accordingly? I think the answer is obvious; and I also think that, if he intentionally shot at this man, the intent to kill might be inferred from the use of a deadly weapon. That he did shoot to hit is testified to by the witness Bell, who states that the respondent told him that he fired at a man; that he fired three shots, but did not know which took effect.

I am also of the opinion that there was testimony tending to show improper relations between the respondent and Mrs. Bowen. True, she testified that there were no such relations, but she was a necessary witness to the *res gestœ*, and cannot conclude the people. There was testimony that respondent was charged with such relations, and did not deny it, but gave an evasive answer. There was testimony that Mrs. Bowen visited him at a lumber camp where he was at work at $26 per month, and that he shortly after returned to her home to work at $20 per month, and continued there, although he knew of the husband's jealousy, and that he attempted to hire another to make way with Bowen. These facts, I think, have some tendency to show improper relations.

I have some doubt upon the question relating to the life insurance. The record discloses that Mrs. Bowen knew of the insurance. There is no direct testimony to the effect that respondent did, but I think the jury might be permitted to infer such knowledge from the other circumstances of the case. If it is found that he was paramour to Mrs. Bowen, this fact, taken together with his offer of $1,000 to any one who would make way with Bowen, might justify an inference of knowledge.

Complaint is made that the court did not, in the charge, define involuntary manslaughter. But the court did what was more favorable to respondent. At the request of respondent's counsel he charged that:

"If you have any reasonable doubt as to his intention, or the killing being accidental, or as to whether he intended to aim in the direction of any one, or whether he was reckless or heedless or not, the respondent is entitled to the benefit of the doubt, and you must acquit."

In my opinion, no prejudicial error was committed by the circuit judge, and the exceptions should be overruled.

HOOKER, J., concurred with MONTGOMERY, C. J.

MOORE, J. I cannot agree with Justice GRANT that a verdict of acquittal should have been directed, nor can I agree with Justice MONTGOMERY that the case should be affirmed. The record is barren of any testimony from which the inference can be fairly drawn that respondent had knowledge that Mr. Bowen had a life-insurance policy which was payable to Mrs. Bowen. It is the testimony of Mr. Bowen that when he left Mrs. Bowen he took this policy with him, and that he could not say that his wife knew whether the policy was in force since then or not. There is no testimony that the respondent ever knew of the existence of this policy. I agree with the opinion of Justice GRANT as to the incompetency of the testimony in relation to the life insurance, and, for this error, think the conviction should be reversed, and a new trial granted.