(No. 20913.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL HOWARD DORR, Plaintiff in Error.

*Opinion filed October 23, 1931—Rehearing denied Dec. 8, 1931.*

BARRATT O'HARA, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Samuel Howard Dorr and Genevieve O'Brien were indicted in the criminal court of Cook county for the murder of William J. O'Brien. They were tried separately. A jury found Dorr guilty and fixed his punishment at imprisonment in the penitentiary for life. Judgment was rendered on the verdict and Dorr prosecutes this writ of error for a review of the record.

The plaintiff in error, Dorr, in the year 1929, conducted an insurance agency at 7455 Cottage Grove avenue, Chicago, and resided with his wife and two children in the first or lower apartment of his two-story building at 7328 Maplewood avenue, about four miles distant from his office. In 1923, Dorr became acquainted with William J. O'Brien while both were in the service of the Chicago Surface Lines as street car conductors. Later, O'Brien, in addition to his employment by the street railway company, worked a part of each day in the office of the recorder of deeds of Cook county. About May, 1928, O'Brien and Genevieve, his wife, moved into the upper apartment of Dorr's building on Maplewood avenue and occupied it thereafter as his tenants. The building faced east and from front to rear the stairway, hall, dining-room and kitchen comprised approximately the north half, and the living-room, Mrs. O'Brien's room, the bath-room and O'Brien's

room, the south half of the upper apartment. A hall connected the two bed-rooms and from this hall on the north, entrance was gained to the bath-room.

Early in the year 1929, Dorr and Mrs. O'Brien manifested an unusual interest in each other. Thereafter they often dined and took automobile rides together and in August they began to have illicit relations. O'Brien's employment by the street railway company occupied his time in the evening and until the early hours of the morning. On November 20, 1929, he returned home from work about 3:00 A. M. He went directly to his room and retired. His wife and the plaintiff in error at the time occupied a bed in her room. About 7:30 o'clock that morning, O'Brien arose, entered the bath-room and closed the door. In a few minutes his wife asked and gained admission and a conversation concerning money followed. After Mrs. O'Brien returned to her room, the plaintiff in error asked her where she kept a revolver which he had given her and which he knew was loaded. The plaintiff in error made a search for the revolver and found it on a shelf in a closet adjoining O'Brien's room. He remained in the closet until O'Brien returned to his room and when the latter opened the closet door and reached for his trousers, the plaintiff in error shot him. The men grappled and in the hall between the two bed-rooms a second shot was fired. O'Brien called his wife and asked why she had the plaintiff in error shoot him. She answered that an electric light bulb must have exploded. The two men continued their struggle toward the front of the apartment and O'Brien had blood on his face. The revolver was discharged a third and a fourth time while the men were in the front hall and both fell down the stairway to a landing between the two floors. The plaintiff in error assisted O'Brien back up-stairs. Mrs. Dorr appeared and inquired whether her husband had remained in O'Brien's apartment during the night and he answered that he had to see that nothing hap-

pened. Mrs. O'Brien professed ignorance of the whereabouts of the plaintiff in error, but added that she had done the shooting and she rubbed the revolver with her hands to remove his finger prints and to substitute her own. Police officers had been called in the meantime and arrived shortly. The plaintiff in error admitted them and they proceeded to the second floor. They found O'Brien sitting in a chair in the living-room and they saw blood on the floor and walls of the apartment. One of the officers asked O'Brien who shot him and he answered the plaintiff in error. The latter was then arrested and taken to the Chicago Lawn police station. O'Brien was removed to the Holy Cross Hospital where, after an examination, his wounds were pronounced fatal. Later in the day, in the presence of several persons and under the fixed belief that death was impending, he stated that the plaintiff in error shot him. The statement was committed to writing by a police officer and was signed by O'Brien.

About 1:00 A. M., November 21, 1929, at the detective bureau, in the presence of two police officers, an assistant State's attorney and a court reporter, Genevieve O'Brien stated that the plaintiff in error shot her husband in the latter's apartment on the morning of the preceding day and that three or four shots were fired. The court reporter later read Mrs. O'Brien's statement to the plaintiff in error and he acknowledged before several witnesses that it was true. During the afternoon of the same day, in the presence of four police officers, the same assistant State's attorney and another court reporter, the plaintiff in error confessed that he shot O'Brien twice at the time and place in question. The confession was reduced to writing and signed by the plaintiff in error in the presence of three witnesses. O'Brien died on November 21, 1929, at about 6:30 P. M.

From the testimony of the plaintiff in error it appears that O'Brien's domestic relations were unhappy; that his

wife was frail and nervous, his treatment of her was brutal and she once attempted to commit suicide; that these considerations and the fact that they were tenants led the plaintiff in error and his wife to visit Mrs. O'Brien often to assist her in various ways; that on the evening of November 19, 1929, they called upon her and remained until after she retired at about 1:00 A. M.; that two hours later O'Brien returned home and shortly thereafter loud talking was heard and Mrs. O'Brien began to scream; that the plaintiff in error and his wife went up-stairs, where they found O'Brien holding Mrs. O'Brien by the hair, and after restoring quiet, returned to their apartment; that in the morning the plaintiff in error was awakened by his wife because she heard a commotion up-stairs during which a shot was fired; that again they went to the second floor and found O'Brien with a revolver in his hand holding Mrs. O'Brien who was screaming; that the plaintiff in error asked O'Brien what his purpose was, he answered that he had none and he supplemented his answer by inquiring why the plaintiff in error did not remain down-stairs; that after further discussion which became increasingly animated, the latter jumped between O'Brien and his wife, grasped the husband by the hands and O'Brien's revolver was discharged; that the plaintiff in error succeeded in obtaining possession of the revolver and endeavored to leave the apartment; that as he ran he fell over a chair and the revolver was again discharged; that O'Brien followed him and recovered the revolver before he could regain his feet; that a struggle ensued, the plaintiff in error was pushed against the wall, another shot was fired and both men fell down the stairway to the landing, O'Brien holding the revolver; that when the plaintiff in error discovered that O'Brien was shot, he called a doctor; that soon a police squad arrived in front of the building; that he admitted the police officers and accompanied them up-stairs where O'Brien was seated in the living-room with the revolver

in his hand; that one of the officers said that O'Brien accused him of the shooting and that he was then arrested and taken to the police station. The plaintiff in error denied that he ever had illicit relations with Mrs. O'Brien.

At the opening of the trial, the plaintiff in error made a motion that the court reconsider its ruling granting a severance to Genevieve O'Brien, and the motion was denied. The plaintiff in error then moved for a postponement of the trial, which was also denied and complaint is made of the latter ruling. No reason was assigned and no proof of any character was offered in support of the motion to postpone. The plaintiff in error was indicted on November 27, 1929, he was arraigned and pleaded not guilty two days later, and the case was called for trial on January 2, 1930, thirty-four days after he had entered his plea. Under these circumstances and in the absence of a showing of some sufficient reason for delay, the motion was properly denied. *People* v. *Hauke,* 335 Ill. 217; *People* v. *Singer,* 288 id. 113.

The confession of the plaintiff in error, it is argued, was not voluntarily made and was therefore inadmissible in evidence. To determine the admissibility of the confession, a hearing was conducted out of the jury's presence. Four witnesses testified that no reward or inducement was offered to obtain, nor was there a resort to threat or abuse to compel the making of, the confession, but that it was freely and voluntarily made. No countervailing evidence was offered on the preliminary hearing. Before the jury, the prosecution again, by a number of witnesses, established the same facts respecting the confession, while the plaintiff in error, on the contrary, testified that it was the result not only of long hours of questioning without food or sufficient sleep, but also of his desire to obtain the release of his wife and children who had been detained at the police station. A review of the evidence shows that the confession was made voluntarily, without inducement or compulsion

of any character, and it was properly admitted in evidence. *People* v. *Fisher,* 340 Ill. 216; *People* v. *Costello,* 320 id. 79.

It is contended by the plaintiff in error that the trial court erred in admitting in evidence two policies of insurance upon the life of O'Brien, one dated May 17, 1929, and the other May 25, 1929, each for two thousand five hundred dollars and both payable to Genevieve O'Brien as the beneficiary. The theory of the prosecution was that a conspiracy existed between the plaintiff in error and Mrs. O'Brien to murder the latter's husband not only that they might continue their illicit relationship, but also that they might profit by collecting the proceeds of the policies after O'Brien's death. The facts in evidence which the prosecution argues show the conspiracy are the following: Mrs. O'Brien had taken automobile rides with the plaintiff in error since March, 1929; she had called at his office and taken lunch with him at different times; he entered her apartment through the rear door; she had illicit relations with him since August, 1929; after she attempted suicide he said he could not permit her to act in that fashion even if he would have to dispose of O'Brien and Mrs. Dorr; he took a revolver which he had given Mrs. O'Brien and shot her husband when the latter opened the closet door; when O'Brien expressed his amazement at the firing of the shot his wife replied that probably an electric light bulb had exploded although she knew that the plaintiff in error only a few moments before had made inquiry for the revolver, and after the shooting, she said that she had fired the shots and rubbed the revolver to remove the finger-prints of the plaintiff in error.

The two life insurance policies were written by the plaintiff in error in May about two months after he and Mrs. O'Brien began to show an infatuation for each other. Mrs. O'Brien was named as the beneficiary in the policies. Their existence, the knowledge the plaintiff in error had of their contents and his relations with Mrs. O'Brien were circum-

stances which tended to show that he had a motive for seeking the death of O'Brien and the evidence was competent for that purpose. The weight to be accorded to the evidence, it was the jury's province to determine.

Evidence of the financial condition of the plaintiff in error was also introduced by the prosecution to show a motive for the murder of O'Brien, and it is contended that the evidence was improperly admitted. It appeared that on November 20, 1929, the plaintiff in error was in arrears in the payment of his office rent; that he owed an insurance company approximately $5000 and was indebted to other persons in small sums and that he was unable to pay these debts. For several months preceding O'Brien's death, the plaintiff in error had made payments in reduction of his indebtedness for office rent. It was shown that payment of the insurance company's claim had not been urged, and that it was not unusual for such a company to have as large a claim against a general agent. The other debts were insignificant. The facts adduced, standing alone, were insufficient to warrant a legitimate inference that financial embarrassment induced or influenced the plaintiff in error to kill O'Brien. There was no certain connection between the facts shown and the conclusion which it was sought to derive from them. (*Commonwealth* v. *Jeffries*, 89 Mass. 548, 566). A person's lack of money or even insolvency, without other incriminating facts or circumstances, does not justify the suspicion that, to improve his financial condition, he will commit one of the graver crimes of violence. (1 Wigmore on Evidence,—2d ed.—sec. 392(2)). The evidence of the pecuniary embarrassment of the plaintiff in error should have been excluded.

It is contended that the erroneous admission of the evidence concerning the financial condition of the plaintiff in error is fatal to the judgment rendered because, it is argued, the punishment fixed by the jury might have been less severe if the evidence had been excluded, and *People* v. *Lane*, 300

Ill. 422, and *People* v. *Heffernan,* 312 id. 66, are relied upon to sustain the contention. Upon an indictment for murder the jury not only determine the guilt or innocence of the defendant, but also, if the verdict be guilty, the punishment, within the statutory limits, to be inflicted. The defendant in such a case has the right, first, to have his guilt or innocence of the particular charge determined without the introduction of irrelevant evidence of other crimes committed by him, and second, to have his punishment, if found guilty of the crime charged, fixed with reference solely to the facts and circumstances of that crime and not by considering in addition other unrelated crimes which he may have committed. In each of the two cases upon which the plaintiff in error relies the charge was murder and the death sentence was imposed. Evidence of other unconnected felonies committed by the respective defendants had been erroneously admitted, the evidence was necessarily highly prejudicial in character and this court was therefore compelled, in each case, to reverse the judgment and to remand the cause for a new trial. In the present case the extreme penalty was not pronounced. No evidence of other crimes was offered or introduced. The evidence of the financial condition of the plaintiff in error was not of a prejudicial character. Errors in the admission of evidence which could not reasonably have affected the defendant prejudicially afford no basis for a reversal of the judgment. *People* v. *Cleminson,* 250 Ill. 135; *People* v. *Halpin,* 276 id. 363; *People* v. *Haensel,* 293 id. 33; *People* v. *Weir,* 295 id. 268; *People* v. *Cardinelli,* 297 id. 116; *People* v. *Durkin,* 330 id. 394.

Complaint is made that the trial court erred in refusing to give the jury two instructions requested by the plaintiff in error. The abstract of record contains certain instructions but it fails to show that they constitute all the instructions given on the trial. In such a situation, the refusal

to give instructions cannot be considered. (*People* v. *Ball*, 333 Ill. 104; *People* v. *Allegretti*, 291 id. 364). An examination of the refused instructions, however, discloses that the court properly refused to give them.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*