(No. 23086.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* IRVING WEITZMAN, Plaintiff in Error.

*Opinion filed October 24, 1935—Rehearing denied Dec. 5, 1935.*

FRANKLIN J. STRANSKY, EDWARD M. KEATING, and HAROLD L. LEVY, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, A. B. DENNIS, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, JOHN T. GALLAGHER, EMMETT MOYNIHAN, JOHN S. BOYLE, and RICHARD H. DEVINE, of counsel,) for the People.

Per CURIAM: Eli M. Daiches, an advertising agency executive, was shot and killed while in an automobile enroute to his Chicago office on March 3, 1934. An indictment was returned in the following October by a Cook county grand jury jointly charging the defendant, Irving Weitzman, and Jack London and James Murphy, (alias Walter Murphy, alias McManamon, the last his true name,) with the crime of murder. London was not apprehended, and Murphy (for such we will call him) was used by the People as its principal witness against defendant, Weitzman, both before the grand jury and at the trial. On a jury verdict of guilty a judgment of life sentence was imposed upon defendant in the criminal court of Cook county. The case comes here for review by writ of error.

Daiches was an active and important member of the Thomas M. Bowers Advertising Agency in Chicago, and that concern, as the beneficiary, carried $286,595.49 of insurance upon his life. Weitzman was the active member and heavily interested, with his brother Leon, in a bakery corporation in Chicago. Another brother, Louis Weitz-

man, who lived in New York, had been the owner since 1929 of 424 out of 430 shares of stock in the Bowers agency, and at various times had loaned that concern money which totaled, as an existing debt, about $120,000. The bakery concern at approximately the same time was obligated to a Chicago bank on a $25,000 loan, which the bank insisted should be paid. After the death of Daiches the Bowers agency collected on the insurance policies and paid the debt it owed to Louis Weitzman. Afterwards the bakery company loan from the bank was paid with money obtained by defendant from his brother Louis. As defendant had been a client of the Bowers agency he and Daiches were well acquainted. Defendant had become acquainted with London in 1932 in a hand-book place that he was accustomed to visit in order to place bets on horse races. He first met Murphy in August, 1933, through London, who tried unsuccessfully to persuade defendant to finance them in a gambling venture. That same month Murphy and London did some guard duty at the bakery during some labor troubles. The record shows Murphy and London to be well-known underworld characters. Daiches left his South Side hotel apartment on the morning of March 3 and proceeded in his car toward his office, in the loop district. The car, driven by Charles Bowman, his colored chauffeur, went east to the outer drive, where traffic conditions brought it to a stop. As the traffic cleared and Bowman prepared to enter the outer drive, a dark-colored Ford car pulled in front of the Daiches car and a man alighted carrying a sawed-off shot-gun. This he fired through the car window at Daiches, killing him instantly. Bowman immediately left his car and ran back to the hotel, where he reported the shooting. On the next morning, March 4, defendant was taken into custody and questioned about his connections with Daiches but released. The following October defendant was again taken into custody and brought to the office of the State's attorney, where he

saw Murphy. After defendant was in custody for over fifty hours he secured his release by a writ of *habeas corpus*. Murphy was released a short time before but was immediately re-arrested on a charge of robbery with a gun. Their indictment for the murder of Daiches soon followed.

At the trial the People used many witnesses, but the testimony of Murphy was relatively more important than that of the others and will be treated in greater detail. On direct examination Murphy testified, in substance, as follows: That his right name is Walter McManamon, although he has at different times used various aliases; that before his arrest he lived on Eighty-first street, but since that time he has resided with his wife and two police officers at the Oak Park Arms Hotel; that in the company of London he first met defendant in August or September, 1933, at the bakery; that the two were there for the purpose of taking care of some labor trouble, at the request of defendant. He said that near the middle of September the three again met in the bakery, and defendant told them he wanted a man killed and asked them to take the job; that the intended victim was a man engaged in business with defendant's brother, and the price to be paid was $5000, of which sum $2000 was to be paid before the killing and the balance after it was done. He related that some time later defendant met the witness and London and paid over $1000; that in the meantime the intended victim, Daiches, had been pointed out to London, who in turn had pointed him out to the witness. He testified that some two or three weeks after this payment another meeting was held in the bakery and defendant asked for a report, wanting to know why Daiches had not been killed. On October 10 the police arrested witness and London while they were watching for Daiches. By this time they had received another $1000 from defendant. London introduced the witness to Arthur Emblem, telling him, at the time, Emblem had beaten Daiches up some time before at the behest of

defendant; that Emblem was joining in with them, as he had been trailing Daiches, knew his habits, and had rented a room next to a flat on Oak street which was occupied by a girl that Daiches visited. He said the three spent nearly all of one night in Emblem's room, London and the witness being armed, waiting for Daiches to leave the girl's flat in order to waylay him. Murphy asserted that in the second week of December all three met defendant at Forty-seventh and Lake Park at night. The ·three were surprised by police and a squad car pursued and captured them. They were subsequently released, but not until the three (Murphy, London and Emblem) had been photographed together. This photograph has been introduced in evidence. During the last part of December Murphy said that he and London met defendant in the bakery and they were told by him that Daiches was going to Florida. He said defendant thought it would be a good idea to kill him down there, as it would "take the heat off of Chicago and the investigation;" also, that his brother had Daiches insured for $250,000. A short time later, Murphy related, defendant turned over to the two men $1000 as expense money on the Florida trip. Murphy said that he and London reached Florida on New Year's eve and registered at the Strand Hotel, in Miami. He used the alias of Lynch and London used that of Miller. According to a pre-arranged plan he said they received a telephone call from defendant in Chicago informing them on what train Daiches would arrive; that the two men watched Daiches leave the train and depart in a cab with a girl; that a telegram from defendant informed them that Daiches would stop at a certain hotel, and they found him at the one named; that defendant came to Florida and met them in their room, and that he complained of their lack of success and urged haste. The witness further said that while they were in Florida he received $200 by telegraph from defendant, which was sent to him through the agency of one Tom Kelly; that

later he and London returned to Chicago, where they met defendant the last part of February, and the latter agreed to call the money then advanced, ($3200,) expense money, and said he would pay the $5000 agreed upon and a bonus of $1000 more for the quick disposal of Daiches. Murphy said he and London met one Jerry Pilot the same evening, and Pilot agreed to kill Daiches for $3000, getting another man to assist him. On March 2 Murphy said London pointed Daiches out to Pilot, who set the killing for the next day. The next morning Murphy said he and London drove to the locality where Daiches was to be killed, and they saw Pilot and another man waiting in a car, which was a four-door Ford sedan. Pilot, he said, was in the driver's seat and some man unknown to them was seated by him. Signals were exchanged between the parties and the Daiches car was seen to leave the hotel. They saw it intercepted by Pilot's car and heard two loud reports and one or two smaller shots. London and Murphy then passed the Daiches car, looked in and saw him slumped down in the rear seat, the door of the car being open and a window shot out. Murphy said he contacted defendant the next afternoon and received $500, which he turned over to Pilot. A little more than a week later he said London received $2500 more in the Chicago Theater, and this was also delivered to Pilot. According to Murphy, $2000 was given to him by defendant in the Southtown Theater about April 1 and $1000 more was paid two weeks later in the Central Park Theater. By pre-arrangement Murphy said that he and London met defendant at the home of the former, and he was told that the two did not think they were treated rightly in view of the amount of the insurance. They recited a need for more money, as they were opening a gambling place at Union Pier, Michigan. He testified that defendant agreed to pay more, and said that he would come to Union Pier some night that week. He did so and found out that they wanted $25,000

additional, to which he assented, asking for time to raise it. Murphy testified that defendant paid two more visits to Union Pier, once bringing $2000 and another time $3000, and that $2000 more was delivered about the middle of August. Murphy stated that defendant requested more time, as his brother Lou had collected $100,000 and had given defendant only $25,000, Lou using the balance to pay his debts. In the middle of September, Murphy said, he and London received $9000 more from defendant—the last they claim to have received before Murphy was arrested and London made his get-away.

On cross-examination, Murphy, without any compunction, admitted that he conspired to aid in the murder of Daiches for money in order to live luxuriously without working; that he had been indicted for the murder, but no *capias* had been served on him and he had not pleaded to the indictment; that he was also under indictment for robbery with a gun, and no *capias* had been served on him under that indictment nor had he been required to plead. He said that he had not been confined in jail since his indictment in October (the trial did not start until the following February) but lived with his wife in the hotel in the custody of police from the office of the State's attorney. While at the hotel he said he was allowed to go out driving, to take extensive walks, to go to shows, to visit his mother, and to attend places where he could bet on the races—all under guard of the two police officers. He said all of his expenses while at the hotel, including car expense, were paid by the State's attorney's office. Murphy said he would not hesitate to commit perjury to save himself and possessed no conscientious scruples in that respect. He said he lied to the grand jury, that he lied in the first stories he told to the police, that he had not done honest work for ten or twelve years, and had been a bootlegger. He said that he expected some consideration to be shown him for the testimony he was giving; that he gave the tes-

timony not for the sake of seeing justice done but to save himself, and he would sacrifice defendant to do so. According to his statement the police told him he would get the "hot seat" but consideration would be asked in his behalf if he told the truth. In conclusion, he related that on a Sunday evening, a short time before the trial commenced, the two assistant State's attorneys, Moynihan and Boyle, who were prosecuting the defendant, had dinner with the witness. He further related that he was arrested around October 10 and taken to the State's attorney's office, where he was questioned by a police officer, Sergeant Kelly, who called attention to witness' near proximity to the "hot seat" (electric chair). He said he was further questioned, but he told nothing but downright lies until he found out that the police had been able to tie him with some of the incidents of the Daiches affair, and he then told the truth— i. e., the same as the story related on direct examination. This was two days before he was released on a writ of *habeas corpus,* and he said the police and the assistant from the State's attorney's office did not tell the magistrate before whom he was brought for a hearing on the writ that he had participated in the Daiches murder.

Defendant, Weitzman, went on the witness stand in his own behalf. In addition to denying his participation in the murder of Daiches in any way, he testified to the following effect on such points as we deem important in this review: That in the fore part of January, 1934, he and his wife went to Florida for a few days and then on to New Orleans; that he did not see either London or Murphy on this trip; that two of his brothers for several years had maintained a summer cottage at Union Pier, and during the summers of 1933 and 1934 he had spent practically every week-end at their cottage. He admitted seeing and talking with London in Union Pier when London showed to him his gambling lay-out. He also said he saw Murphy at the same resort but at no time ever talked with him. He

testified that all of the alleged meetings with Murphy, London and Emblem in the bakery, theaters, and at all other places mentioned by Murphy in Chicago, Florida and Michigan, were not, in fact, held, and that the only times he and Murphy came in contact were during the labor trouble at the bakery, the time he saw Murphy at Union Pier, and after their arrest. Defendant emphatically denied engaging either Murphy, London, Emblem, Pilot or the stranger at the shooting to harm or kill Daiches on that day or any other day. He denied ever paying the different sums of money to any of them as related by Murphy, with the exception of the $40 given to London and to Murphy for guard duty at the bakery on the morning of the labor trouble. Defendant testified that he did not receive $25,000 or any other sum from his brother, but that the bakery company had received the sum named and it was used to liquidate company indebtedness owed to the bank. He said that Daiches was killed in March and the bank did not press him for payment until in May, and that none of the $25,000 went either to Murphy, London, Emblem or Pilot.

The only witnesses whose testimony tended in any way to directly corroborate the testimony of Murphy were Andrew Askew, a negro bell-boy from the Strand Hotel, in Miami, and Tom Kelly, a gambler, who testified that he wired the $200 to Murphy and London in Miami at defendant's specific request. Askew, on the stand, in February, 1935, was able to point to the photograph heretofore referred to and say that Murphy and London were at the hotel in January, 1934. He testified that at this time he distinctly remembered seeing defendant in the room of the two men. He bases his recollection of the event because at first he thought defendant was a certain jockey named Gilbert. He had no occasion to recall who was in the room during all of the intervening months until just a few days before coming to Chicago to testify. His testimony is rendered largely incredible by his own admissions that the

Strand Hotel contains sixty-eight rooms and caters principally to a transient trade, with heavy turn-over of guests during the winter season. He said jockeys stay at the hotel during January, and all are little men, and defendant was a total stranger to him. When asked as to the dress of Murphy, London and defendant at the time the three were allegedly together in Miami, this witness could give no satisfactory answer. It is clear that his testimony is without corroborative effect.

Tom Kelly's efforts on the witness stand to identify the telegram also ended in complete failure. The original telegram by which the $200 was sent to Murphy in Miami was in evidence. Kelly was given a blank telegraphic form like the original. The inserted portions of the original telegram were dictated to Kelly and he inserted them in writing in the blank before him. He was then requested to fill out the blanks on a third and like form but this time printing the inserted portions instead of writing them. He complied, and this last form and the original exhibit were then inspected by two highly-qualified handwriting experts. Both without hesitation said that the original exhibit and the third form bore no resemblance whatever in respect to the inserted portions, and they were able to advance good and abundant reasons to back their opinions. The telegrams are all in evidence and even a non-expert would quickly come to the same conclusion. It should be noted that the prosecution could not or did not offset this expert testimony, by which the value of Kelly as a corroborative witness was exploded. Moreover, the value of his testimony was further lessened by the fatal variance between when and where he said he sent the telegram and the actual time and place of its sending. The story of Kelly is highly improbable—especially that he would pay out of his own pocket the charges for sending the money by telegraph in a matter in which he had no personal interest and as a favor to one who was little more than a stranger to him.

The testimony of Murphy must be believed to be true in order to sustain defendant's conviction. His testimony as to defendant's part in the conspiracy to murder Daiches was totally denied and contradicted by defendant himself. Murphy, by his own testimony, is an admitted perjurer, robber, murderer, conspirator and accomplice, and his story linking defendant with the murder plot is difficult to believe and was not corroborated in any of its essential details. These circumstances alone would be sufficient to cause a reversal of the judgment in this case regardless of the many prejudicial errors committed by the trial judge, to which we shall hereafter call attention.

At the trial Emblem was called by the State to testify. He objected because he had been in the custody of the People for the last four months and said he had no counsel. A colloquy was carried on in the presence of the jury, following which William Scott Stewart appeared to represent Emblem. The jury were then excused and after further discussion they were again returned to the jury box. The court then addressed Emblem as follows: "Sir, you are a witness in this case and indicted along with this defendant in a conspiracy case. Do you want to testify in this case?" Then followed several minutes more of discussion between the court and the lawyers, in the presence of the jury. It must be remembered that defendant was on trial here for murder, and the remarks of the trial judge to Emblem that he had been indicted with defendant in a conspiracy case referred to an altogether different proceeding. The remarks of the trial judge in the presence of the jury, and his insistence that Emblem state the reasons for his refusing to testify after Emblem had once been excused on the ground that his answer might invade his constitutional rights, were all highly prejudicial to defendant.

The record is made unduly voluminous by the unnecessary introduction in evidence of twenty-eight separate insurance policies and a large quantity of life insurance

records and checks relating to the different policies, all payable to the Thomas M. Bowers Advertising Agency. The evidence shows, without the slightest contradiction, that defendant had no interest whatever in the Bowers agency and no interest of any kind either in the insurance policies or checks introduced in evidence. Under these circumstances the court erred in admitting this evidence over the objection of counsel for defendant, as the jury must have been impressed by the ruling of the court that defendant was in some way interested or connected with these various insurance transactions. It is obvious that defendant should not have been bound or prejudiced in any manner by the introduction of documents and other evidence of transactions to which he was not a party and in which he had no right or title. (*People* v. *Alward,* 354 Ill. 357.) In this connection it was shown that defendant was not a stockholder or otherwise interested in the Bowers agency. There is a lack of any proof that defendant's brother Louis had any knowledge or participation in the alleged murder plot. The fact that this brother in New York owned a controlling interest in the stock of the Bowers agency—an interest which he had bought after Daiches took out the insurance—shows no interest on the part of defendant such as would make proper the admission of these books and records. The books and accounts of the Bowers agency, in the absence of any such connecting proof, were therefore irrelevant to the issues and on objections made should have been refused admittance.

Objections are made to certain instructions. It is not necessary to comment upon these objections at length. We might add, however, that instruction No. 7, given by the trial judge, was in part erroneous. This instruction is as follows: "Walter Murphy, is one defined by law to be an accomplice to the crime charged in this indictment. The testimony of an accomplice is competent evidence but such testimony is liable to grave suspicion and should be acted

upon with great caution. If the testimony of an accomplice carries conviction and the jury are convinced of its truth beyond a reasonable doubt they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness." The last phrase of this instruction, "and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness," is contradictory and should not have been included. It is in direct violation of what this court has said of similar instructions in *People* v. *Rongetti,* 338 Ill. 56, and *People* v. *Lawson,* 345 id. 428. We have examined the other instructions complained of but find in them no substantial error worthy of comment when considered in connection with the proof in this case. Moreover, no objections to the instructions are properly preserved.

The remarks of the assistant State's attorney in his closing argument, that the Bowers agency was in financial straits prior to the murder of Daiches and did not have money enough to pay premiums due on the Daiches life insurance policies were unsubstantiated by any evidence in the record. (*People* v. *Dorr,* 346 Ill. 295.) In recent cases this court, (*People* v. *Maria,* 359 Ill. 231; *People* v. *Deal,* 357 id. 634;) and the Supreme Court of the United States, (*Burger* v. *United States,* 79 L. ed. 667,) have severely condemned inflammatory and intemperate remarks of prosecutors who have overstepped the bounds of fact and propriety in their closing arguments to the jury.

The judgment of the criminal court of Cook county is reversed and the cause is remanded.

*Reversed and remanded.*

Mr. JUSTICE WILSON took no part in this decision.