(No. 31972.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY GOUGAS, Plaintiff in Error.

*Opinion filed November 27, 1951.*

ELLIS & WESTBROOKS, and W. CHESTER KITCHEN, both of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, WILLIAM J. McGAH, JR., JAMES A. BROWN, and ARTHUR DILLNER, all of Chicago, of counsel,) for the People.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

Henry Gougas was indicted in the criminal court of Cook County for the murder of Donald Hugh Simms. A jury found him guilty and fixed his punishment at imprisonment in the penitentiary for life. Judgment was rendered on the verdict and Gougas prosecutes this writ of error for a review of the record.

The facts necessary to this opinion show that the plaintiff in error and the deceased had been friends for many years and that in October, 1949, plaintiff in error, together with his wife, Nannie, and their five children, moved into a portion of a residence at 4625 St. Lawrence Street in Chicago, of which the deceased was the managing agent. Plaintiff in error's family occupied the ground floor of the building while the deceased occupied a room on the second floor. The balance of the second floor rooms were tenanted by a family named Clarke. The relationship of plaintiff in error and his wife seemed to become progressively worse from October, 1949, to May, 1950, largely because of his failure to support his family and because of his cruel treatment of the wife. The friendship of the wife with the deceased seems to have strengthened during the same period and the latter at times apparently furnished food and money

for the needs of the Gougas family and gave Nannie Gougas assistance with her household duties. Early in May, 1950, Nannie Gougas discussed with both men the possibility of getting a divorce, and the deceased, who was to be a witness for her, contacted his lawyer in her behalf. On approximately Saturday, May 13, Nannie told plaintiff in error that she did not want to live with him any more because she was afraid of him and felt that he would never hold a job. She also told him that she planned to get a divorce and that the deceased would be her witness. It is apparent, too, that both she and the deceased informed plaintiff in error of their plan to be married after the divorce. Pursuant to his wife's request, plaintiff in error moved from the residence on Saturday, May 13.

Within the next few days plaintiff in error returned to the premises several times and talked to his wife about the divorce. He testified that on one occasion when he attempted to see his wife at an early hour in the morning, he left without seeing her when he was met at the door by the decedent who held a gun in his hand. Plaintiff in error again returned to the premises about 9:00 o'clock, the night of May 18, and was admitted to the front room of the ground floor by one of the Clarke children. Several minutes later Nannie Gougas, who was in the kitchen, and the Clarke family, upstairs, heard shots in the front room. Nannie ran upstairs to the Clarkes' quarters and was followed by plaintiff in error who was brandishing a gun. She hid in a clothes closet and plaintiff in error, evidently being unable to find her, left the room and immediately after witnesses heard one or two shots fired in the hallway of the second floor. Plaintiff in error then left the premises and the Clarkes discovered Donald Simms's body sprawled in a sitting position on the sofa in the downstairs front room. He had been shot between the eyes. The room showed no signs of a struggle but the deceased had a broken portion of a comb clasped in his left hand; the other por-

tion was found on the floor. His right hand was in his trouser pocket gripping a fully loaded automatic pistol which was ready to fire. Plaintiff in error was taken into custody by the police at a hospital where he was being treated for a bullet wound in his head near his right ear. When questioned by the officers he stated: "I killed my best friend," and when asked why he had done so, he said: "Ask my wife."

The prosecution appears to have been based on two separate theories; first, that plaintiff in error was motivated by the fact that he was a partial beneficiary of a National Service Life Insurance policy on the life of the deceased, and, second, that he was moved to commit the crime because of jealousy and unrequited love. A defense of self-defense was interposed by the plaintiff in error. In support of its first theory, the prosecution was permitted, over objection, to introduce into evidence copies of the policy and of letters from the Veterans' Administration which established that plaintiff in error was the beneficiary of forty per cent of its proceeds. The record shows only that the policy and letters were found after the homicide, by the father of the deceased, in a drawer where the deceased kept his personal papers. It is the plaintiff in error's contention that it was error to admit such evidence in the absence of a showing that the accused knew of the existence of the policy beneficial to him, that it was a valid and subsisting contract and that the defendant believed it to be such. The People assert that the objection made in the trial court was not broad enough to sustain the contention made in this court and that proof of knowledge on the part of the plaintiff in error goes to the weight, rather than to the admissibility, of the policy and letters.

While it is true that any evidence which tends to show that an accused had a motive for killing the deceased is always relevant, as rendering more probable that he did kill him, it is also the rule that such evidence to be com-

petent must, at least to a slight degree, tend to establish the existence of the motive relied upon or alleged. (*People* v. *Meyer,* 331 Ill. 608; *People* v. *Holtz,* 294 Ill. 143; *State* v. *Felker,* 27 Mont. 451, 71 Pac. 668.) In the *Felker case,* where the trial court admitted life insurance policies to establish motive without a showing that defendant had knowledge of them, the reviewing court in holding that the trial court should have stricken the evidence of its own volition, stated as follows: "The defendant could not possibly have entertained any purpose to murder the deceased in order to secure the payment of the policies to the wife, as the State sought to show, without knowledge of the fact of their existence. Nor would the additional fact that he knew of their existence render them of any evidentiary value or pertinence in the absence of some showing that they were valid, subsisting contracts, or that the defendant believed them to be such." A like result was reached by the court in *People* v. *Morgan,* 124 Mich. 527, 83 N.W. 275; see, also, 40 C.J.S. Homicide, sec. 235.

We find no parallel to the foregoing cases in our own jurisdiction. However, in *People* v. *Weitzman,* 362 Ill. 11, this court held that where a defendant was charged with the murder of an executive of a business firm, insurance policies on his life payable to the firm were inadmissible in evidence where there was no showing that the defendant was a stockholder or otherwise interested in the firm. The same decision further held that, although the defendant's brother owned a controlling interest in the firm, such fact did not render the policies admissible in the absence of proof that the brother had any knowledge of, or participated in any way in, the crime charged. Also, in *People* v. *Alward,* 354 Ill. 357, an arson case, we held that evidence of the existence of insurance on the property burned was not competent where there was no proof that the defendant had any knowledge of the existence of the insurance, or that he had any motive to commit arson. In both cases the

defendant's knowledge of the existence of the insurance by which he would gain was the governing factor in determining the competency of the policies as evidence.

It is true, of course, that there are innumerable cases, such as *People* v. *Dorr,* 346 Ill. 295, *State* v. *Leuch,* 198 Wash. 331, 88 Pac. 2d 440, and *Johnson* v. *State,* 186 Ga. 324, 197 S.E. 786, wherein insurance policies beneficial to an accused or a co-conspirator have been admitted in evidence to establish motive for homicide. However, in all such cases that we have examined there was ample affirmative evidence to show that the defendant knew of the existence of the policies, and the courts have commented on that knowledge in holding the policies to be competent evidence. Such cases are easily distinguished from the one under consideration, for the record here is barren of any showing, or attempted showing, that the plaintiff in error had knowledge of the policy and of his beneficial interest in it. The policy, and the letters relating to it, standing alone in evidence before the jury, do little more than excite a suspicion of guilt and are not of the convincing character which satisfies the mind that plaintiff in error was motivated by any thought of gain from the insurance when he committed his homicidal assault on the deceased. On the record made, the policy and letters do not measure up as competent evidence and it was error to admit them.

Other errors assigned in this court by the plaintiff in error complain of further incompetent evidence and of certain of the instructions to the jury, both given and refused. Without detailing it, we are constrained to remark that during the trial there was considerable evidence elicited by the prosecution which had no tendency to prove the issue being tried but served only to cause the jury to believe that the plaintiff in error was a cruel and evil man, likely to commit such a crime as the indictment charged. Evidence of this nature has been repeatedly condemned, particularly where one is on trial for his life. (*People* v.

*Wilson,* 400 Ill. 461 ; *People* v. *Lewis,* 313 Ill. 312; *People* v. *Newman,* 261 Ill. 11.) What the jurors might have done had the case been submitted to them without the aspersions cast at the plaintiff in error, and without the incompetent evidence relating to the insurance policy, cannot be judicially determined, and his right to a fair and impartial trial can be protected only by affording him a new trial.

While other points urged by plaintiff in error may have merit, they are such as will probably not recur upon another trial and their discussion would serve no beneficial purpose.

The judgment of the criminal court of Cook County is, accordingly, reversed and the cause remanded for a new trial.

*Reversed and remanded.*